370 So.2d 764 (1979)
In re Petition of POST-NEWSWEEK STATIONS, FLORIDA, INC., for Change in Code of Judicial Conduct.
No. 46835.
Supreme Court of Florida.
April 12, 1979.
*765 Talbot D'Alemberte and Donald M. Middlebrooks of Steel, Hector & Davis, Miami, for petitioner.
Joseph C. Jacobs of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, for the Florida Association of Broadcasters, Inc.
Parker Lee McDonald, Ex-Chairman, Orlando, and Harold R. Clark, Chairman, Jacksonville, for the Florida Conference of Circuit Judges.
Richard C. McFarlain, Tallahassee, for The Florida Bar.
Robert Eagan, State's Atty., and Donald A. Lykkebak, Asst. State's Atty., Orlando, for the State of Florida.
Ellis S. Rubin of the Ellis Rubin Law Offices, Miami, for Rommie L. Loudd.
A. Broaddus Livingston, Chairman, and Larry S. Stewart, Chairman-Elect, Miami, for Trial Lawyers Section of The Florida Bar.
C. Gary Williams of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for Society and Professional Journalists, Sigma Delta Chi, Southeast Region and Greater Miami Chapter.
Allan Milledge and Alan Rosenthal of Milledge & Hermelee, Miami, for Sunbeam Television Corp., intervenors.
Richard E. Gerstein, State's Atty., and N. Joseph Durant, Jr., Chief Asst. State's Atty., Miami, for Florida Prosecuting Attorneys Association.
Harold Peter Barkas, Miami, for the Academy of Florida Trial Lawyers.
Joel Hirschhorn of Hirschhorn & Freeman, Miami, Jack O. Johnson, Public Defender, Bartow, for the Florida Public Defender Association.
Thomas M. Pflaum, Asst. Atty. Gen., Tallahassee, for the Atty. Gen. of the State of Florida, amici curiae.
SUNDBERG, Justice.
After careful deliberation, we deal today with whether the electronic media[1] shall be permitted access to the courtrooms of the State of Florida to cover and report judicial proceedings. The issue emerged on January 24, 1975, when Post-Newsweek Stations, Florida, Inc. filed its petition for change in the code of judicial conduct  specifically Canon 3 A(7).[2] This is a matter of *766 original jurisdiction in this Court pursuant to article V, Florida Constitution.
Respondents to the petition, intervenors, and amici curiae include: the Florida Association of Broadcasters, Inc.; the Florida Conference of Circuit Judges; The Florida Bar; the attorney general of the State of Florida; Rommie L. Loudd; the Trial Lawyers Section of The Florida Bar; the Society of Professional Journalists, Sigma Delta Chi, Southeast Region and Greater Miami Chapter; the Florida Prosecuting Attorneys Association; the Florida Public Defender Association; the Academy of Florida Trial Lawyers; and Sunbeam Television Corporation. Pursuant to the Court's invitation, individuals, officials, organizations, and corporations too numerous to mention have filed comments, reports, and exhibits which number in the thousands of pages.

HISTORY OF THE PROCEEDINGS
By order filed May 21, 1975, this Court denied the portion of the petition which sought approval of a proposed substitute for Canon 3 A(7) but granted the portion seeking a reexamination of the canon for the purpose of making the Court's own revision, if it was so disposed. Pursuant to this order the Court received sundry materials, favorable and opposed, and observed a television video tape prepared under the auspices of the Supreme Court of Washington. Upon examination of these materials, the Court determined that an on-site experimental program should be conducted in the Second Judicial Circuit involving the televising of one civil and one criminal trial subject to specific guidelines, including the consent of all participants. Petition of Post-Newsweek Stations, Florida, Inc., 327 So.2d 1 (Fla. 1976). By order dated April 12, 1976, the foregoing interlocutory decision was supplemented to include still photography cameras within the purview of the experiment.
Due to difficulty in obtaining the required consent of participants to conduct the experiment in the Second Judicial Circuit, on September 17, 1976, the Court authorized an expansion of the experiment to include the Ninth Judicial Circuit,[3] and then on December 21, 1976, to include the Fourth and Eighth Judicial Circuits. A termination date of April 1, 1977, was imposed for securing the conduct of the experimental trials. Notwithstanding the territorial enlargement, the attempt to conduct the experimental trials, subject to participant consent, met with total failure. Nevertheless, it was the view of the Court that a test period during which trials would be conducted with electronic media coverage was essential to a reasoned decision on the petition for modification of Canon 3 A(7). Accordingly, by supplemental interlocutory decision filed April 7, 1977, the Court invoked a one-year pilot program to commence on July 1, 1977, during which the electronic media would be permitted to cover judicial proceedings in the courts of this state, without participant consent, but subject to the prior adoption of standards with respect to conduct and technology. Petition of Post-Newsweek Stations, Florida, Inc., 347 So.2d 402 (Fla. 1977). In our decision we requested the parties to develop and submit proposed standards for adoption by the Court prior to July 1, 1977.
On June 14, 1977, we filed our opinion promulgating the standards of conduct and technology to govern the one-year pilot program. Petition of Post-Newsweek Stations, Florida, Inc., 347 So.2d 404 (Fla. 1977). A copy of the standards is appended to this opinion as Appendix 1. The opinion called for the experiment to commence at 12:01 a.m. on July 5, 1977, and to end at 11:59 p.m. on June 30, 1978. Pursuant to this authorization, proceedings at all levels of the Florida court system were covered by the electronic media. Only trial court proceedings *767 were covered by the radio broadcast media. More than 2,750 persons participated as judge, attorney, court attache, juror, or witness in trials covered by the electronic media during the experimental period.[4] Although this Court issued several administrative orders clarifying the standards during the course of the pilot program, consistent with the terms of the standards no appellate review was afforded to representatives of the electronic media from orders entered by the trial courts ruling upon matters arising under the standards.
Pursuant to paragraph 9 of the Court's opinion filed June 14, 1977, the parties, media participants in the program, and all participating judges were requested to furnish to the Court, at the conclusion of the pilot program, a report of their experiences under the program. By application dated March 3, 1978, counsel for petitioner requested the Court (i) to allow current submission of papers evaluating the experiment to date and (ii) to allow the continuation of full media coverage after July 1, 1978, pending final decision upon the petition for amendment of Canon 3 A(7). In response the Court established an accelerated briefing schedule and enlarged the invitation for comments concerning the experiment to include any member of the public who had participated, but denied the request to extend the pilot program beyond June 30, 1978. Petition of Post-Newsweek Stations, Florida, Inc., 358 So.2d 1360 (Fla. 1978). In rejecting an extension of the termination date, it was stated:
The avowed purpose of the pilot program authorized in these proceedings was to aid this Court in reaching a reasoned decision upon the application for modification of Canon 3 A(7). No cause has been made to appear to require a modification of the procedure earlier established and, in fact, a revision of this procedure arguably will impede the orderly consideration of the issues by this Court.
358 So.2d at 1361.
The pilot program terminated on June 30, 1978. Briefs, reports, letters, resolutions, comments, and exhibits were received through mid-August, 1978. The amount of materials submitted was imposing. The comments reflect honest and deeply felt convictions concerning the propriety of admitting the electronic media to the courtrooms of the State of Florida. We would be remiss not to pause here and accord recognition to the overwhelming majority of trial judges of this state who, while generally unsympathetic to the experiment, made a good faith effort to comply with the terms and spirit of the pilot program. They, once again, demonstrated the quality of our judiciary which, parenthetically, is an important factor in reaching our decision today.

THE SURVEY
At the time of the initial experiment which was to involve only two trials, it was contemplated that academicians from the Florida State University System would interview all trial participants as soon after their participation as feasible. Their responses were to be transcribed and filed in these proceedings as evidence. Unhappily, the interview technique proved impractical once the one-year pilot program was instituted. However, shortly before conclusion of the program a representative of the academic community[5] urged upon us the feasibility of a sample survey of the attitudes of the nonjudicial participants[6] in the judicial proceedings which had been covered by the electronic media during the experimental period. Although it was apparent that no controlled experiment could be conducted *768 due to the lapse of time, the Court was persuaded that a post hoc sample survey of the participants' attitudes would be an aid to our decision, though by no means conclusive. After consultation with counsel for the parties and with their cooperation, we called upon the Judicial Planning Coordination Unit of the Office of the State Courts Administrator (OSCA) to identify through court records the participants in trials which had received electronic media coverage and to devise appropriate questionnaires for submission to the nonjudicial participants. The parameters established for development of the survey were: (i) responses would be sought only from individuals who had participated in or were associated with trials that had electronic media coverage; (ii) judges would not be included in the survey;[7] (iii) all data would be collected by August 4, 1978; and (iv) all responses would remain anonymous. The final survey questionnaires[8] evolved through an eclectic process of review and modification by the Court, the parties, OSCA staff, and interested academicians. The questionnaires were essentially based upon a five-point, modified Lickert scale, but with an additional summary question permitting the expression of personal views.[9]
The questionnaires were distributed on July 19, 1978. The majority of the responses were received by the August 4, 1978 deadline. The survey response was extraordinarily high (1349). The percentage response was:

 Witness 44%
 Attorney 65%
 Court Personnel 72%
 Juror 65%
 Combined Response Rate 62%[10]
Results of the survey were compiled by OSCA staff and filed as a report in this cause on November, 1, 1978.[11]
Mindful that the survey results are non-scientific and reflect only the respondents' attitudes and perceptions about the presence of electronic media in the courtroom, nonetheless, the results do provide some general indications:
(1) Presence of the electronic media in the courtroom had little effect upon the respondents' perception of the judiciary or of the dignity of the proceedings.[12]
(2) It was felt that the presence of electronic media disrupted the trial either not at all or only slightly.[13]
(3) Respondents' awareness of the presence of electronic media averaged between slightly and moderately.[14]
(4) The ability of the attorney and juror respondents to judge the truthfulness of witnesses was perceived to be affected not at all.[15] The ability of jurors to concentrate on the testimony was similarly unaffected.[16]
(5) All respondents were made to feel slightly self-conscious by the presence of electronic media.[17]
(6) Both jurors and witnesses perceived that the presence of electronic media made them feel just slightly more responsible for their actions.[18]
(7) Presence of electronic media made all respondents feel only slightly nervous or more attentive.[19]
*769 (8) The distracting effect of electronic media was deemed to range from almost not at all for jurors, to slightly for witnesses and attorneys.[20]
(9) The degree to which jurors and witnesses felt the urge to see or hear themselves on the media fell between not at all and slightly.[21]
(10) Presence of electronic media affected the different participants' sense of the importance of the case in varying degrees. Jurors felt that it made the case more important to a slight degree; witnesses to a degree between slightly and moderately; court personnel slightly; and attorneys moderately.[22]
(11) To a degree between not at all and slightly, jurors perceived that the presence of electronic media in the courtroom during the testimony of a witness made that witness's testimony more important.[23]
(12) There was no significant difference in the participants' concern over being harmed as a result of their appearance on electronic media broadcast (including still photography) as opposed to their names appearing in the print media. In each instance the concern ranged on the scale between not at all and slightly.[24]
(13) Jurors and witnesses manifested the same attitude concerning the possibility that persons would attempt to influence their decision or testimony. There was no discernible difference in the height of their concern as between electronic and print media; the average response was slightly on the lower end of the spectrum between not at all and slightly.[25]
(14) Court personnel and attorneys perceived that the presence of electronic media made the participating attorneys' actions more flamboyant only to a slight extent.[26]
(15) Court personnel and attorneys were of the attitude that the presence of electronic media affected the flamboyancy of witnesses to a degree between not at all and slightly.[27]
(16) They also felt that the witnesses were slightly inhibited by the presence of electronic media[28] and that jurors were made slightly self-conscious, nervous, and distracted, but also slightly more attentive.[29]
No survey sample was taken with respect to participants in appellate proceedings. However, no response, positive or negative, was received from any source commenting upon experience in the appellate courts. From our own experience with electronic media coverage of oral arguments before this Court during the pilot program we found absolutely no adverse effect upon the participants' performance or the decorum of the proceedings.

SURVEY OF THE FLORIDA CONFERENCE OF CIRCUIT JUDGES
As earlier noted, judges were not included in the sample survey conducted by OSCA because the Conference of Circuit Judges had previously conducted a survey of its membership. Those survey results were included as an appendix to the report filed in this cause by the Conference. There was a 54% response to the survey. Approximately two-thirds of the respondents (96-50) indicated some experience with electronic media during the pilot program. Of these, thirty-six indicated positive reaction, twenty-nine negative reaction, and thirty-seven neutral. The circuit judge under whose direction the survey was administered reported that "the neutrals generally made favorable comments as `I am neutral but the press were professional, no disturbances, *770 etc.'"[30] In response to questions 6, 7, and 8 of the survey, it was the reaction of the circuit judges (90 to 95%) that jurors, witnesses, and lawyers were not affected in the performance of their sworn duty by the presence of electronic media.[31]
Although the Florida Conference of Circuit Judges takes a position in its filed report in opposition to any change in Canon 3 A(7), the empirical data collected in its survey, particularly from respondents who experienced electronic media coverage, does not seem to support the formal position taken. As stated by Circuit Judge Arthur J. Franza in his survey recapitulation and analysis:
From the whole, I think Courts do not object to the use of cameras in the courtroom now that they have had some experience. However, in certain areas, some Judges have strong opinions. Paramount being:
1. That the presiding Judge have control of his courtroom.
2. That confidential or undercover agents who are witnesses, victims of crimes, family especially children of the convicted, and juvenile proceedings not be photographed.[32]

HISTORY OF AMERICAN BAR ASSOCIATION CANON 35
Sparked by the spectacular publicity and broadcast attendant to the trial of Bruno Hauptmann for the Lindbergh kidnapping,[33] the American Bar Association House of Delegates adopted a resolution creating a Special Committee on Cooperation Between Press, Radio, and Bar.[34] The resolution also suggested a complete ban of radio broadcasting and still photography during judicial proceedings to prevent a breach of judicial decorum.[35] A canon, designated Canon 35 proscribing photographic and broadcast coverage of courtroom proceedings was adopted by the American Bar Association House of Delegates in 1937.[36] A second Special Committee of the American Bar Association, in 1952, produced a report that caused the House of Delegates to amend Canon 35 to proscribe televising court proceedings as well. A majority of states adopted the substance of Canon 35. Its current form is found in Florida as Canon 3 A(7).
Forty years after the adoption of Canon 35 by the House of Delegates of the American Bar Association, that association's Adjunct Committee on Fair Trial-Free Press commenced, on August 9, 1977, a reevaluation of standards relating to Fair Trial-Free Press. The committee released its proposed revised standards on February 11, 1978. They included a provision sanctioning courtroom coverage by electronic media under conditions to be established by local rule or by agreement with representatives of the news media, provided it could be carried out unobtrusively and without affecting the conduct of the trial.[37] The proposed standard expressly concluded that electronic media coverage of judicial proceedings "is not per se inconsistent with the right to a fair trial."[38] The commentary makes clear that no right of access by electronic media is created by the standard; that is left to *771 the discretion of the trial court absent the establishment of a general policy by the highest court of a jurisdiction.
On March 22, 1978, the Standing Committee on Association Standards for Criminal Justice reviewed and favorably recommended the adjunct committee's proposed standard. After meetings on April 8 and 9, 1978, the Committee on Criminal Justice and the Media recommended that the Council of the Section of Criminal Justice "endorse the proposed electronic media standard." However, despite these two previous favorable committee recommendations, the Council of the Section of Criminal Justice voted 7-5 on April 30, 1978, not to support the proposed standard. The comments of each reviewing body were transmitted to the Committee on Association Standards for Criminal Justice which presented all Fair Trial-Free Press standards to the House of Delegates. At its midwinter meeting in February, 1979, the House of Delegates of the American Bar Association considered and rejected the proposed standard relating to electronic media coverage of court proceedings.
The total prohibition of photographic and televised coverage of court proceedings contained in Canon 3 A(7) was also the subject of a special committee created by the late Chief Justice William O'Neill of the Conference of Chief Justices in February, 1978. On August 2, 1978, the Conference of Chief Justices by a vote of forty-four to one, with one abstaining, approved a modification of the canon which would allow each of the states, by its highest court, to establish necessary standards and guidelines for radio, television, and photographic coverage of court proceedings.

DUE PROCESS CONSIDERATIONS
The opponents to revision of Canon 3 A(7) assert that electronic media coverage of courtroom proceedings is per se a denial of due process under the fourteenth amendment to the Constitution of the United States. The assertion is founded on Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). The Supreme Court first encountered the issue in Stroble v. California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952). Stroble was convicted in 1949 of first degree murder for the brutal sex-slaying of a young child. The crime, arrest, and trial generated pervasive and sensationalized newspaper, radio, and television publicity. The district attorney periodically released "play-by-play" press releases, and the California Legislature convened in special session and held committee hearings in various parts of the state to study the problem of sex crimes. The record does not disclose exactly which portions of the court proceedings were televised or photographed. The trial judge apparently permitted televising of the seating of the jury, portions of the hearings, and the verdict return. Still photographs were taken throughout the trial.
Stroble contended that the extraordinary amount of prejudicial publicity had created a lynch mob atmosphere and fatally infected his trial. He also objected to the presence of television and still photography cameras in the courtroom. The California Supreme Court and the United States Supreme Court rejected these contentions and held that Stroble received a fair and impartial trial.
The California Supreme Court directly addressed the cameras in the courtroom issue. They viewed the presence of cameras as improper but not unconstitutional:
We can also assume that it was improper to allow the taking of news photographs or televising of scenes in the court room; but there is no indication that the jury's verdict was influenced by the taking of the pictures or the televising of court room scenes.
People v. Stroble, 36 Cal.2d 615, 226 P.2d 330, 334 (1951).
The United States Supreme Court affirmed the conviction in Stroble without specifically alluding to this issue. In dissent, Justice Frankfurter made bare reference to the televising of certain portions of the trial but failed to confront the problem head-on. 343 U.S. at 199-200, 72 S.Ct. 599.
*772 In Estes v. Texas, the Supreme Court dealt with the notorious televised trial of Billy Sol Estes on charges of swindling. The facts portray a carnival-like proceeding incessantly interrupted by reporters, cameras, and cameramen. In his opinion for the Court, Justice Clark described the scene in this way:
Petitioner's case was originally called for trial on September 24, 1962, in Smith County after a change of venue from Reeves County, some 500 miles west. Massive pretrial publicity totaling 11 volumes of press clippings, ... had given it national notoriety. All available seats in the courtroom were taken and some 30 persons stood in the aisles. However, at that time a defense motion to prevent telecasting, broadcasting by radio and news photography and a defense motion for continuance were presented, and after a two-day hearing the former was denied and the latter granted.
These initial hearings were carried live by both radio and television, and news photography was permitted throughout. The videotapes of these hearings clearly illustrate that the picture presented was not one of that judicial serenity and calm to which petitioner was entitled... Indeed, at least 12 cameramen were engaged in the courtroom throughout the hearing taking motion and still pictures and televising the proceedings. Cables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table. It is conceded that the activities of the television crews and news photographers led to considerable disruption of the hearings.
381 U.S. at 535-36, 85 S.Ct. at 1629 (citations omitted).
Based on these facts, the Court had little trouble in finding that Estes was denied due process.[39] The plurality opinion contains sweeping language which at first blush appears to cast doubt upon the constitutionality of any televising of a criminal trial. In his concurring opinion, however, Justice Harlan demonstrates that the Estes decision is limited to its peculiar facts:
The Estes trial was a heavily publicized and highly sensational affair. I therefore put aside all other types of cases ... The resolution of those further questions should await an appropriate case; the Court should proceed only step by step in this unplowed field. The opinion of the Court necessarily goes no farther, for only the four members of the majority who unreservedly join the Court's opinion would resolve those questions now.

381 U.S. at 590-91, 85 S.Ct. at 1663-64 (emphasis supplied).
Moreover, Justice Clark's characterization of the issue before the Court in Estes belies the seemingly expansive reach of the decision:
While petitioner recites his claim in the framework of Canon 35 of the Judicial Canons of the American Bar Association he does not contend that we should enshrine Canon 35 in the Fourteenth Amendment, but only that the time-honored principles of a fair trial were not followed in his case and that he was thus convicted without due process of law... . In short, the question here is not the validity of either Canon 35 of the *773 American Bar Association or Canon 28 of the State Bar of Texas,[40]but only whether petitioner was tried in a manner which comports with the due process requirement of the Fourteenth Amendment.

381 U.S. at 535, 85 S.Ct. at 1629 (emphasis supplied).
The Court expressly limited its opinion to the crude state of the television art existing in 1965 and acknowledged the advent of technological advances. "When the advances in these arts permit reporting by printing press or by television without their present hazards to a fair trial we will have another case." 381 U.S. at 540, 85 S.Ct. at 1631. Justice Clark, while noting that "at this time those safeguards [to ensure a fair trial] do not permit the televising and photographing of a criminal trial,"[41] concluded with the clear message that the decision did not forever proscribe such electronic media coverage:
It is said that the ever-advancing techniques of public communication and the adjustment of the public to its presence may bring about a change in the effect of telecasting upon the fairness of criminal trials. But we are not dealing here with future developments in the field of electronics. Our judgment cannot be rested on the hypothesis of tomorrow but must take the facts as they are presented today.
381 U.S. at 551-52, 85 S.Ct. at 1637.
Justice Harlan, the swing vote in the plurality, echoed the underlying philosophy and restricted scope of Justice Clark's opinion:
Finally, we should not be deterred from making the constitutional judgment which this case demands by the prospect that the day may come when television will have become so commonplace an affair in the daily life of the average person as to dissipate all reasonable likelihood that its use in courtrooms may disparage the judicial process. If and when that day arrives the constitutional judgment called for now would of course be subject to re-examination in accordance with the traditional workings of the Due Process Clause.[42]
381 U.S. at 595-96, 85 S.Ct. at 1666.
Of particular interest is Justice Harlan's express recognition of the benefits to be derived from state experimentation with electronic media coverage. "Forbidding this innovation ... would doubtless impinge upon one of the valued attributes of our federalism by preventing the States from pursuing a novel course of procedural experimentation."[43] 381 U.S. at 587, 85 S.Ct. at 1662.
In opinions subsequent to Estes, the United States Supreme Court has reaffirmed the narrow scope of that decision. In Nebraska Press Association v. Stuart, 427 U.S. 539, 552, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), the Court stated that in Estes the volume of trial publicity, the judge's failure to control the proceedings, and the telecast of a hearing and the trial itself combined to deny the defendant due process. In Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), Justice Marshall delineated the holdings of Sheppard v. Maxwell[44] and Estes in this manner:

*774 The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.
421 U.S. at 799, 95 S.Ct. at 2036.
Neither decision characterized Estes as imposing a per se constitutional ban on the televising of state criminal trials.
Similarly, several lower courts have concluded that televised coverage of a criminal trial is not a per se denial of a defendant's right to due process. Bradley v. Texas, 470 F.2d 785 (5th Cir.1972); CBS, Inc. v. Lieberman, 439 F. Supp. 862 (N.D.Ill. 1976); Gonzales v. People, 165 Colo. 322, 438 P.2d 686 (1968).
It is our conclusion, then, that without demonstration of prejudice, there is no per se proscription against electronic media coverage of judicial proceedings imposed by the fourteenth amendment to the United States Constitution nor by article I, section 9, Florida Constitution.

FIRST AND SIXTH AMENDMENT CONSIDERATIONS
While we have concluded that the due process clause does not prohibit electronic media coverage of judicial proceedings per se, by the same token we reject the argument of the petitioner that the first and sixth amendments to the United States Constitution mandate entry of the electronic media into judicial proceedings. We are satisfied that this issue was laid to rest not only in the Estes[45] decision, but more recently in Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), where with particular reference to the sixth amendment, it was stated:
Respondents contend that release of the tapes is required by the Sixth Amendment guarantee of a public trial. They acknowledge that the trial at which these tapes were played was one of the most publicized in history, but argue that public understanding of it remains incomplete in the absence of the ability to listen to the tapes and form judgments as to their meaning based on inflection and emphasis.
In the first place, this argument proves too much. The same could be said of the testimony of a live witness, yet there is no constitutional right to have such testimony recorded and broadcast. Estes v. Texas, supra [381 U.S.], at 539-542, 85 S.Ct. [1628] at 1631-32. Second, while the guarantee of a public trial, in the words of Mr. Justice Black, is "a safeguard against any attempt to employ our courts as instruments of persecution," In re Oliver, 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948), it confers no special benefit on the press. Estes v. Texas, 381 U.S., at 583, 85 S.Ct., at 1653 (Warren, C.J., concurring); id., at 588-589 (Harlan, J., concurring). Nor does the Sixth Amendment require that the trial  or any part of it  be broadcast live or on tape to the public. The requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed. Id., at 588-589, 85 S.Ct. at 1662-1663 (Harlan, J., concurring). That opportunity abundantly existed here.
435 U.S. at 610, 98 S.Ct. at 1318 (footnotes omitted).
Accordingly, our decision in this case is predicated upon the supervisory authority which reposes in this Court pursuant to article V of the Florida Constitution and not upon any constitutional imperative.

CONSIDERATIONS AGAINST ALLOWING ELECTRONIC MEDIA COVERAGE OF JUDICIAL PROCEEDINGS
The opponents to electronic media coverage of judicial proceedings have raised a *775 multitude of issues militating against such coverage. The grounds for objection can be classified into the following categories: (i) physical disturbance or disruption; (ii) adverse psychological effect on the participants in carrying out their solemn duties in connection with the decision-making process; (iii) exploitation of the courts for commercial purposes as opposed to the performance of an educational function; (iv) prejudicial publicity; (v) effect on particular categories of witnesses, i.e., confidential informants, victims, relatives of victims, minors, witnesses under protection of anonymity, prisoners; and (vi) privacy rights of participants. It is asserted that each adversely bears upon the ability of the parties to receive a fair and impartial trial.

(i) Physical disruption.

After sifting through the voluminous arguments, comments, survey results, and concessions of the opponents,[46] it is apparent that through application and enforcement of the standards imposed by the Court during the pilot program, physical disturbance was so minimal as not to be an arguable factor.[47] Technological advancements have so reduced size, noise, and light levels of the electronic equipment available that cameras can be employed in courtrooms unobtrusively. The standards adopted by the Court vested in the chief judges the means to position electronic media representatives in locations which would be least obtrusive while permitting reasonable access to coverage. Furthermore, the standards with respect to pooling and resolution of media disputes appear to have proved workable during the pilot period. Comments received indicate that while disputes arose from time to time, the burden was properly shifted to media representatives to resolve those disputes without involving the trial judge as arbitrator. In a number of instances the media, both with and without participation of the court, established protocols to anticipate and deal with problem areas.[48]
A related issue is whether the very presence of electronic media in the courtroom detracts from the decorum of the proceedings. The attitudes of all participants surveyed clearly indicate that there is no such discernible effect.[49]

(ii) Psychological effect.

Because of the scanty empirical data available to permit an assessment of the psychological impact upon courtroom participants, opponents assert that the presence of electronic media will have myriad adverse effects. They maintain that: (1) lawyers will "grandstand" or "play to the cameras" to advance their own self interests; (2) judges will engage in "posturing"  particularly at election time; (3) witnesses will either assume a stage presence and "ham it up" or will be so intimidated as not to be able to present fairly their testimony; (4) jurors will either be distracted from concentrating on the evidence and the issues to be decided by them or, because of their identification with the proceedings, they will fear for their personal safety, be subjected to influence by members of the public, or attempt to conform their verdict to community opinion; and (5) the presence of electronic media in the courtroom will make that case appear to the participants to be a cause celebre and, therefore, prevent an objective and dispassionate presentation and resolution of the issues. These are concerns that any fair minded person would share because they would, certainly in combination, be antithetical to a fair trial. The fact remains, however, that the assertions are but assumptions unsupported by any evidence. No respondent has been able to point to any instance during the pilot program period where these fears were substantiated. Such evidence as exists would appear to *776 refute the assumptions. The Survey reflects that the assumed influences upon participants during the experimental period were perceived to vary in degree from not at all to slightly. More importantly, there was no significant difference in the presence or degree of these influences as between the electronic and print media. Ante 769. Similarly, it was the opinion of an overwhelming majority (90-95%) of respondents to the survey of the Florida Conference of Circuit Judges that jurors, witnesses, and lawyers were not affected in the performance of their sworn duty in the courtroom. Ante 770. With particular reference to the charge of an inflated appearance of newsworthiness created by the presence of the electronic media in the courtroom, it must be recognized that newsworthy trials are newsworthy trials, and that they will be extensively covered by the media both within and without the courtroom whether Canon 3 A(7) is modified or not. Consequently, if it is deemed to be to the public advantage to permit electronic media coverage in the courtroom, it seems inappropriate to be dissuaded by honestly perceived but unsubstantiated concerns as to adverse psychological effects on participants.

(iii) Exploitation of the courts for commercial purposes as opposed to the performance of an educational function.

Some of the opponents maintain that the electronic media is but an entertainment form without serious content and that editing practices not only eliminate any educational value but mislead the public as to the judicial process and the issues in a particular proceeding. We have been treated to the spectre of a three-minute segment coverage of the local trial sandwiched between a dog food commercial on the one end and a panty hose commercial on the other. That may be. However, nothing prohibits the print media from juxtaposing just such advertisements against its news story covering the same trial. Surely it has occurred. Just as surely the image and majesty of the judiciary has survived unsullied. We perceive no discernible difference in commercial exploitation of the courts by the electronic media as contrasted with the print media.
As to the lack of serious content on the part of the electronic media, we must concede that much of its broadcast time is devoted to entertainment. However, so too is substantial space in newspapers and magazines devoted to cartoons, comics, sports, entertainment, advertising, and the like. Is a "men's entertainment" magazine more calculated to educate and less to entertain than the local television station? At best the answer to that question is a value judgment, but no one would seriously suggest that a reporter for such a magazine should be precluded from covering and reporting a trial because it is not intended to educate or inform the public  that it intends only to exploit the courts commercially. Furthermore, a medium which has brought us such events as the funeral of assassinated President John F. Kennedy, the landing of the first man to reach the moon, and the Hearings on Watergate and Related Activities Before the Senate Select Committee on Presidential Campaign Activities cannot be said to be altogether without serious content.
We must also concede that selective editing, with or without ulterior motive, can affect the accuracy with which a legal proceeding is reported. However, this is true of all segments of the media, including the sketch artist, and no one in recent memory has suggested that as a basis for denying the print media access to the courtroom. The judiciary's concern in matters of media content and editorial policy as it relates to judicial proceedings is limited to those words or depictions which present an imminent and serious threat to the administration of justice.[50]

*777 (iv) Prejudicial publicity.

This point raises two issues: (a) that witnesses placed under the rule which excludes them from the courtroom while other witnesses testify and jurors will be contaminated in the fulfillment of their oath and performance of their duty by viewing excerpts of the trial on television; and (b) that it will be impossible to secure a fair and impartial jury for retrial of a case or for the trial of a codefendant who is tried separately. In regard to witness and juror influence, our response is threefold. First, the allegation assumes that witnesses and jurors are either incapable or unwilling to abide by their solemn oath or directions from the court. We will not indulge in this assumption, for to do so would be to impeach the foundation of our system of justice. Second, the assertion simply is not borne out by the responses in the two surveys of participants in the year-long pilot program.[51] Third, we discern no appreciable difference in this regard between willful exposure to the electronic media as opposed to the print media. A witness or juror disposed to disregard an oath or direction from the court is just as apt to read about the trial in the newspaper as to view a film of it on television or to listen to it on a radio broadcast.
The problem of retrials or the separate, subsequent trial of a codefendant, is one only of degree. Just as electronic media broadcast may contaminate a prospective venire, so may extensive newspaper coverage. Furthermore, it is unrealistic to equate the presence of electronic media in the courtroom with the amount of publicity which will be generated about any trial. Newsworthy trials will be covered by the electronic media whether from within or without the courtroom. Even without access to the courtroom, television news broadcasts often utilize artist sketches, still photographs, or out-of-court films of the participants coupled with quotations or paraphrasing of testimony or legal argument which takes place in the courtroom. Who can assess whether this type of coverage will be any less sensational or have any less impact on the community than an accurate, direct broadcast of the events occurring in the courtroom. A situation similar to the one under consideration occurred in the "Watergate" conspiracy and obstruction of justice trial of Messrs. Haldeman, Ehrlichman, and Mitchell. United States v. Haldeman, 181 U.S.App.D.C. 254, 559 F.2d 31 (1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). It is hard to conceive of a trial preceded by more pervasive media coverage, including live telecast of the hearings before the United States Senate. Nonetheless, the court held that it was not error for the trial court to deny, prior to attempting selection of a jury, either a request for protracted continuance or for change of venue from the District of Columbia. The court further affirmed the verdicts and judgments of guilt against an attack of prejudicial publicity upon review of the voir dire examination. The court there made an interesting comment concerning the impact of pretrial publicity which has significance beyond that case.
Our own reading of the 2,000-page voir dire demonstrates that the Government's assessment of the public interest in Watergate matters is correct. Most of the venire simply did not pay an inordinate amount of attention to Watergate. This may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which interest them may be less fascinating to the public generally.

181 U.S.App.D.C. at 285 n. 37, 559 F.2d at 62 n. 37 (emphasis supplied).
Be that as it may, the issue presented is ordinarily one of determining the existence of actual prejudicial publicity whether before or at the trial. In the case of the former, voir dire examination has proven to be an effective method of insuring jury impartiality and of gauging whether prejudice is so great that an impartial jury cannot be selected from the community. Murphy v. Florida, supra. In the extreme case a continuance or change of venue is an effective judicial tool to remedy the situation. *778 Where witness and juror prejudice is suspected or anticipated at trial, the judicial devices of court instruction, and sequestration in extreme cases, may be employed. There is no evidence that accurate electronic transmission of events in a public courtroom would enhance the potential for prejudice of witnesses and jurors. Nor has it been demonstrated that such transmission would generate a need to change the present standard for gauging prejudice.

(v) Effect on particular categories of witnesses.

Experience during the pilot period demonstrated that there were occasional instances of significant adverse impact on some categories of witnesses. Although the standards as adopted by this Court recognized "the authority of the presiding judge conferred by statute, rule or common law to control the conduct of proceedings before him," no standard for exercise of the judge's discretion in this regard was articulated.[52] As a result, some of the problems relating to electronic media coverage of certain categories of witnesses anticipated by the opponents did, in fact, arise. In the case of State v. Paul Jacobson, Case No. 75-8791, Eleventh Judicial Circuit of the State of Florida, the electronic media asserted the right to photograph witnesses who were under federal protection and relocated about the country to protect their identity.[53] After a hearing the presiding judge declined to permit such coverage.
In State v. Herman, Case No. 77-1236, Fifteenth Judicial Circuit of the State of Florida, two problems occurred concerning the coverage of certain types of witnesses. The widow of the deceased murder victim sought to prohibit electronic media coverage of her appearance as a witness. The presiding judge overruled her claimed right to privacy under the ninth and fourteenth amendments to the United States Constitution and article I, section 1, Florida Constitution. Both this Court[54] and the Federal District Court for the Southern District of Florida refused to intervene.[55] During the same trial Judge Sholts denied the objection to electronic media coverage interposed by an inmate of the Florida Corrections System who had been called as a witness by the state. Spurred by the fear of reprisals from fellow inmates if she testified, the prisoner refused to take the stand and as a result was held in contempt.[56] It is not clear that in either instance the presiding judge perceived that discretion reposed in him to grant the objection by the witness.
In State v. Bannister, Case No. 77-521-CF-A-01, Twelfth Judicial Circuit of the State of Florida, the presiding judge considered but refrained from prohibiting electronic media coverage of the testimony of a sixteen-year-old rape victim. The District Court of Appeal, Second District, intervened to the extent of requesting the trial judge to hold a hearing on such proposal, after notice to the media, before entering any order prohibiting media coverage. Times Publishing Co. v. Hall, 357 So.2d 736 (Fla.2d DCA 1978). Although not invoked, the presiding judge apparently concluded that this Court's standards provided him discretionary authority to bar electronic media coverage of a particular witness.
The foregoing examples demonstrate that unique problems can arise with respect to particular participants in a judicial proceeding. They do not, however, reveal any compelling reason for refusing to amend Canon 3 A(7). What is called for is an articulated standard for the exercise of the presiding judge's discretion in determining whether it is appropriate to prohibit electronic media coverage of a particular *779 participant. Implicit in this statement, of course, is the conclusion that in certain instances it is appropriate to prohibit electronic media coverage of particular participants. This is so because, for certain trial participants, there is a qualitative difference between the printed word and a photograph. Electronic media coverage of certain child custody proceedings could have a devastating impact on the welfare of the child participant. The future well-being of the child far outweighs the public's interest in being informed of such proceedings. And we can conceive of situations where it would be legally appropriate to exclude the electronic media where the public in general is not excluded.[57] Similar considerations can present themselves where prisoners, confidential informants, sexual battery victims, relatives of victims, and witnesses under protection of anonymity are concerned. However, we deem it imprudent to compile a laundry list or adopt an absolute rule to deal with these occurrences. Instead, the matter should be left to the sound discretion of the presiding judge to be exercised in accordance with the following standard:
The presiding judge may exclude electronic media coverage of a particular participant only upon a finding that such coverage will have a substantial effect upon the particular individual which would be qualitatively different from the effect on members of the public in general and such effect will be qualitatively different from coverage by other types of media.

(vi) Privacy rights of participants.

It is contended here that it is an invasion of an espoused right of privacy to compel a witness or juror to appear in a judicial proceeding by legal process, then expose him against his will to the notoriety or publicity attendant to his image appearing in a newspaper, magazine, or television broadcast. This argument fails for two reasons. First, a judicial proceeding, subject to certain limited exceptions, is a public event which by its very nature denies certain aspects of privacy. Second, and more compelling, there is no constitutionally recognized right of privacy in the context of a judicial proceeding. The scope of privacy interests protected by the United States Constitution, which have been characterized as penumbrae formed by emanations from the specific guarantees in the Bill of Rights,[58] has been narrowly circumscribed by recent decisions of the United States Supreme Court to include only matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); see also Laird v. State, 342 So.2d 962 (Fla. 1977), and cases cited therein. Furthermore, there is no express guarantee of a right of privacy contained in the Constitution of Florida, nor has any such constitutionally guaranteed right yet been found to exist through implication. Laird v. State. Consequently, objections to amendment of Canon 3 A(7) predicated upon violation of participants' privacy rights are unavailing.

CONSIDERATIONS FOR ALLOWING ELECTRONIC MEDIA COVERAGE OF JUDICIAL PROCEEDINGS
The proponents for change of Canon 3 A(7) make many claims for permitting electronic media in the courtrooms of Florida. They assert that: (i) there is no logical basis to distinguish between the print and electronic media insofar as access is concerned; (ii) the sixth amendment concept of a public trial is promoted by electronic media coverage; (iii) there is educational value in electronic media coverage; (iv) newsworthy trials will be covered by the electronic media either from within or without the courtroom and that the former is less apt to interfere with a fair trial; (v) the pilot program has demonstrated that the *780 state of the art in television and photographic equipment is such that no disturbance of judicial proceedings results from coverage and, furthermore, that media pooling arrangements prevented any serious problems in connection with coverage; and (vi) the judiciary and the public's confidence in that institution will be enhanced by electronic media coverage.
While we do not accept all of the claims made by the proponents and will not discuss them in detail, we are persuaded that on balance there is more to be gained than lost by permitting electronic media coverage of judicial proceedings subject to standards for such coverage. The prime motivating consideration prompting our conclusion is this state's commitment to open government.[59] We have heretofore articulated this philosophy in the context of the court system:
Reporters are plainly free to report whatever occurs in open court through their respective media. A trial is a public event, and there is no special perquisite of the judiciary which enables it to suppress, edit or censor events which transpire in proceedings before it, and those who see and hear what transpired may report it with impunity, subject to constitutional restraints mentioned herein.
State ex rel. Miami Herald Publishing v. McIntosh, 340 So.2d 904, 908-09 (Fla. 1977) (footnotes omitted).
This principle, that a trial is a public event and that what transpires in an open courtroom is public property, has found expression in numerous United States Supreme Court decisions. See, e.g., Sheppard v. Maxwell, supra; Estes v. Texas, supra; Stroble v. California, supra; Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947).
Electronic media coverage of all other branches and subdivisions of Florida government exists and apparently has served not only to inform the public about the operation of their government but has made the representatives of government act more responsibly. At the advent of gavel-to-gavel television coverage of the Florida Legislature, members of that body expressed many of the same fears held by the respondents before us today. That experience, however, has demonstrated that the legislative process has been enhanced rather than degraded:
Television changes everything it touches. It has subtly altered the legislative process for the better. Many of our legislators had their doubts about the wisdom of gavel-to-gavel televising because they feared television would encourage grandstanding. This did not happen. Instead, television coverage had a favorable impact on the lawmaking process. No one mumbles bills through. You seldom see legislators reading newspapers and never see them eating lunch at their desks during debate any more. (e.s.)
.....
Nowadays, under the eye of the television cameras, those sponsoring bills are far more careful to give the House and the viewing public an adequate explanation of what the pending measure does. In other words, debate has become far more structured.[60]
The court system is no less an institution of democratic government in our society. Because of the courts' dispute resolution and decision-making role, its judgments and decrees have an equally significant effect on the day-to-day lives of the citizenry as the other branches of government. It is essential that the populace have confidence in the process, for public acceptance of judicial judgments and decisions is manifestly necessary to their observance. Florida Bar v. McCain, 361 So.2d 700, 709 (Fla. 1978) *781 (Sundberg, J., concurring). Consequently, public understanding of the judicial system, as opposed to suspicion, is imperative.
Regrettably, public knowledge and understanding of the judicial process is at a low ebb:
The rulers of America, the numerous John Q. Citizens who have intention of becoming lawyers, should be taught what their courts do and why. For alas, they know too little of that subject. American journalism, on the whole, does a poor job of accurately reporting court-doings. Our lawyers have made little effort to explain to the laymen, in intelligible terms, the workings of our judicial system. The resultant public ignorance is deplorable. Our courts are an immensely important part of our government. In a democracy, no portion of government should be a mystery. But what may be called "court-house government" still is mysterious to most of the laity.
J. Frank, Courts on Trial 1 (1949).
This is particularly deplorable in Florida, where we have a system and judges in which we can take pride. Unlike other states where reform of the judicial system has sometimes lagged, Florida has developed a modern court system with procedures for merit appointment of judges and for attorney discipline. Florida courts have proved innovative in developing new concepts to speed the system and improve the administration of justice. We have no need to hide our bench and bar under a bushel. Ventilating the judicial process, we submit, will enhance the image of the Florida bench and bar and thereby elevate public confidence in the system.
In view of the lack of any serious problems of disruption occurring during the term of the pilot program, and supported by the limited empirical data developed through the surveys, it is our judgment that Canon 3 A(7) should be amended to permit access to the courtrooms of this state by electronic media subject to standards adopted by this Court and subject also to the authority of the presiding judge at all times to control the conduct of proceedings before him to ensure a fair trial to the litigants. This judgment is buttressed by a practical reality; newsworthy trials will continue to be covered by the electronic media from without the courtroom if the canon is not altered. We have all been exposed to far too many examples of this out-of-court coverage to believe that it promotes the interests of a fair trial or the image of the judicial process. Proponents represent, and we accept in good faith, that this type of sensational and uncomplimentary coverage will be displaced by the sort of orderly and dignified in-court coverage demonstrated during the pilot program.
In reaching our conclusion we are not unmindful of the perceived risks articulated by the opponents of change. However, there are risks in any system of free and open government. A democratic system of government is not the safest form of government, it is just the best man has devised to date, and it works best when its citizens are informed about its workings.

AMENDMENT OF CANON 3 A(7)
In consideration of the foregoing, Canon 3 A(7) of the Florida Code of Judicial Conduct is amended, effective May 1, 1979, by striking the same in its entirety and substituting therefor the following:
3 A(7)
Subject at all times to the authority of the presiding judge to (i) control the conduct of proceedings before the court, (ii) ensure decorum and prevent distractions, and (iii) ensure the fair administration of justice in the pending cause, electronic media and still photography coverage of public judicial proceedings in the appellate and trial courts of this state shall be allowed in accordance with standards of conduct and technology promulgated by the Supreme Court of Florida.
COMMENTARY
This canon represents a departure from former Canon 3 A(7) [ABA Canon 35]. The former canon generally proscribed electronic media and still photography *782 coverage of judicial proceedings from within and in areas immediately adjacent to the courtroom, with three categories of exceptions  (a) use for judicial administration, (b) coverage of investitive, ceremonial, and naturalization proceedings, and (c) use for instructional purposes in educational institutions. Subject to the limitations and promulgation of standards as mentioned therein, the revised canon constitutes a general authorization for electronic media and still photography coverage for all purposes, including the purposes expressed as exceptions in the former canon. Limited only by the authority of the presiding judge in the exercise of sound discretion to prohibit filming or photographing of particular participants, consent of participants to coverage is not required. The text of the canon refers to public judicial proceedings. This is in recognition of the authority reposing in the presiding judge, upon the exercise of sound discretion, to hold certain judicial proceedings or portions thereof in camera, and in recognition of the fact that certain proceedings or portions thereof are made confidential by statute. The term "presiding judge" includes the chief judge of an appellate tribunal.
In view of the foregoing amendment to Canon 3 A(7), Florida Rule of Criminal Procedure 3.110 is repealed as of the effective date of such amendment.
Pursuant to Canon 3 A(7), as herein amended, the standards of conduct and technology set forth in Appendix 3 attached to this opinion are hereby promulgated to govern electronic media and still photography coverage of judicial proceedings in the courts of the State of Florida.
Because of the protracted and deliberate consideration afforded this matter by the Court, and in view of the desirability of establishing a definitive date for commencement of electronic media coverage, rehearing is dispensed with in this cause and this decision shall be final upon filing.
It is so ordered.
ENGLAND, C.J., and ADKINS, BOYD, OVERTON, HATCHETT and ALDERMAN, JJ., concur.

Appendix to follow.

*783 APPENDIX 1

 PETITION OF POST-NEWSWEEK STATIONS, ETC.
 Cite as, Fla., 347 So.2d 404
 1. Equipment and personnel.
 (a) Not more than one portable television camera
 [film camera  16 mm sound on film (self blimped) or
 video tape electronic camera], operated by not more
 than one camera person, shall be permitted in any
 trial court proceeding. Not more than two television
 cameras, operated by not more than one camera person
 each, shall be permitted in any appellate court
 proceeding.
 (b) Not more than one still photographer, utilizing
 not more than two still cameras with not more than
 two lenses for each camera and related equipment for
 print purposes shall be permitted in any proceeding
 in a trial or appellate court.
 (c) Not more than one audio system for radio
 broadcast purposes shall be permitted in any
 proceeding in a trial or appellate court. Audio
 pickup for all media purposes shall be accomplished
 from existing audio systems present in the court
 facility. If no technically suitable audio system
 exists in the court facility, microphones and related
 wiring essential for media purposes shall be
 unobtrusive and shall be located in places designated
 in advance of any proceeding by the chief judge of
 the judicial circuit or district in which the court
 facility is located.
 (d) Any "pooling" arrangements among the media
 required by these limitations on equipment and
 personnel shall be the sole responsibility of the
 media without calling upon the presiding judge to
 mediate any dispute as to the appropriate media
 representative or equipment authorized to cover a
 particular proceeding. In the absence of advance
 media agreement on disputed equipment or personnel
 issues, the presiding judge shall exclude all
 contesting media personnel from a proceeding.
 2. Sound and light criteria.
 (a) Only television photographic and audio
 equipment which does not produce distracting sound or
 light shall be employed to cover judicial
 proceedings. Specifically, such photographic and
 audio equipment shall produce no greater sound or
 light than the equipment designated in Appendix A
 annexed hereto, when the same is in good working
 order. No artificial lighting device of any kind
 shall be employed in connection with the television
 camera.
 (b) Only still camera equipment which does not
 produce distracting sound or light shall be employed
 to cover judicial proceedings. Specifically, such
 still camera equipment shall produce no greater sound
 or light than a 35 mm Leica "M" Series Rangefinder
 camera, and no artificial lighting device of any kind
 shall be employed in connection with a still camera.
 (c) It shall be the affirmative duty of media
 personnel to demonstrate to the presiding judge
 adequately in advance of any proceeding that the
 equipment sought to be utilized meets the sound and
 light criteria enunciated herein. A failure to obtain
 advance judicial approval for equipment shall
 preclude its use in any proceeding.
 3. Location of equipment and personnel.
 (a) Television camera equipment shall be positioned
 in such location in the court facility as shall be
 designated by the chief judge of the judicial circuit
 or district in which such facility is situated. The
 area designated shall provide reasonable access to
 coverage. If and when areas remote from the court
 facility which permit reasonable access to coverage
 are provided all television camera and audio
 equipment shall be positioned only in such area.
 Video tape recording equipment which is not a
 component part of a television camera shall be
 located in an area remote from the court facility.
 (b) A still camera photographer shall position
 himself or herself in such location in the court
 facility as shall be designated by the chief judge of
 the judicial circuit or district in which such
 facility is situated. The area designated shall
 provide reasonable access to coverage. Still camera
 photographers shall assume a fixed position within
 the designated area and, once a photographer has
 established himself or herself in a shooting
 position, he or she shall act so as not to call
 attention to himself or herself through further
 movement. Still camera photographers shall not be
 permitted to move about in order to obtain
 photographs of court proceedings.
*784 (c) Broadcast media representatives shall not move
 about the court facility while proceedings are in
 session, and microphones or taping equipment once
 positioned as required by 1(c) above shall not be
 moved during the pendency of the proceeding.
 4. Movement during proceedings.
 News media photographic or audio equipment shall
 not be placed in or removed from the court facility
 except prior to commencement or after adjournment of
 proceedings each day, or during a recess. Neither
 television film magazines nor still camera film or
 lenses shall be changed within a court facility
 except during a recess in the proceeding.
 5. Courtroom light sources.
 With the concurrence of the chief judge of a
 judicial circuit or district in which a court
 facility is situated, modifications and additions may
 be made in light sources existing in the facility,
 provided such modifications or additions are
 installed and maintained without public expense.
 6. Conferences of counsel.
 To protect the attorney-client privilege and the
 effective right to counsel, there shall be no audio
 pickup or broadcast of conferences which occur in a
 court facility between attorneys and their clients,
 between co-counsel of a client, or between counsel
 and the presiding judge held at the bench.
 7. Impermissible use of media material.
 None of the film, video tape, still photographs or
 audio reproductions developed during or by virtue of
 the pilot program shall be admissible as evidence in
 the proceeding out of which it arose, any proceeding
 subsequent or collateral thereto, or upon any retrial
 or appeal of such proceedings.
 8. Appellate review.
 So that the Court may evaluate in depth all
 experiences engendered under the program at the end
 of one year, and to preclude appellate activity
 during the test year, (1) no appellate review shall
 be available to the electronic or still photographic
 media from individual orders entered by trial or
 appellate courts ruling upon matters arising under
 these standards, and (2) no appellate court shall
 entertain any petition by the electronic or still
 photographic media for extraordinary writ seeking in
 any way to affect such media reporting of a judicial
 proceeding or proceedings; provided however, that any
 party to this proceeding, any electronic media
 representative or any circuit or district court chief
 judge may at any time during the one-year pilot
 program apply to this Court, with proper notice to
 all parties, to amend the standards set out in this
 Order for the purpose of meeting unforeseen technical
 difficulties in their general application.
 9. Evaluation of program.
 At the conclusion of the one-year pilot program,
 all media participants in the program, all parties
 hereto, and all participating judges are requested to
 furnish to the Court a report of their experience
 under the program, so that the Court can determine
 whether or to what extent Canon 3 A(7) shall be
 modified.
*785 APPENDIX A
FILM CAMERAS ____________ 16mm Sound on Film (self blimped)
 1. CINEMA PRODUCTS CP-16A-R Sound Camera
 2. ARRIFLEX 16mm-16BL Model Sound Camera
 3. FREZZOLINI 16mm (LW16) Sound on Film Camera
 4. AURICON "Cini-Voice" Sound Camera
 5. AURICON "Pro-600" Sound Camera
 6. GENERAL CAMERA SS III Sound Camera
 7. ECLAIR Model ACL Sound Camera
 8. GENERAL CAMERA DGX Sound Camera
 9. WILCAM REFLEX 16mm Sound Camera
VIDEO TAPE ELECTRONIC CAMERAS
 1. Ikegami HL-77 HL-33 HL-35 HL-34 HL-51
 2. RCA TK 76
 3. Sony DXC-1600 Trinicon
 3a. ASACA ACC-2006
 4. Hitachi SK 80 SK 90
 5. Hitachi FP-3030
 6. Philips LDK-25
 7. Sony BVP-200 ENG Camera
 8. Fernseh Video Camera
 9. JVC-8800 u ENG Camera
 10. AKAI CVC-150 VTS-150
 11. Panasonic WV-3085 NV-3085
 12. JVC GC-4800u
VIDEO TAPE RECORDERS/used with video cameras
 1. Ikegami 3800
 2. Sony 3800
 3. Sony BVU-100
 4. Ampex Video Recorder
 5. Panasonic 1 inch Video Recorder
 6. JVC 4400
 7. Sony 3800H
*786 APPENDIX 2
 National Center for State Courts
 300 Newport Avenue
 Williamsburg, Virginia 23185
 (804) 253-2000
 February 7, 1979
 To: Members of the Executive Council
 Conference of Chief Justices
 From: Jag C. Uppal, Director Secretariat Services
 Subject: Television in the Courtroom - Recent Developments
 The enclosed report provides information on significant developments
 concerning the televising of judicial proceedings. While the National
 Center for State Courts has been assisting the state courts in this area
 for some time, the policy resolution[*] adopted last summer by the
 Conference of Chief Justices designated the National Center as the
 Clearinghouse for all photographic and electronic-in-the-courtroom
 information for state and federal jurisdictions.
 The staff of the National Center has been collecting rules, guidelines,
 opinions, reports, articles and other background information pertaining to
 television in the courtroom. All this information has enhanced the
 capacity of the National Center to provide timely assistance to the
 various state supreme courts, special committees, bar associations, media
 organizations, judges and other groups involved in studying the issues
 concerning television coverage. A compendium of materials has been mailed
 out to the Chief Justices and State Court Administrators, including
 material sent in response to specific requests.
 We appreciate the cooperation of the members of the Conference of Chief
 Justices and their staffs for the materials received regarding
 developments in television, radio and photographic coverage of the courts
 in their states. To help us perform the clearinghouse functions more
 efficiently in the future, we would like to encourage you to continue to
 forward us such information. Some of you are aware that we are in the
 process of preparing two grant proposals to further develop the
 clearinghouse capability of the National Center.
 TELEVISION IN THE COURTROOM:
 RECENT DEVELOPMENTS
 The Conference of Chief Justices approved a resolution on
August 2, 1978, recommending that the Code of Judicial Conduct be
amended to permit the supervisory court in each state and federal
jurisdiction to "allow television, radio and photographic
coverage of judicial proceedings in courts under their
supervision." Since August, 1978, Supreme Courts in five states 
Alaska, California, Idaho, N. Dakota, Oklahoma and West Virginia
 have already amended their rules to allow television coverage
on an experimental basis for varying periods. The rule in New
Hampshire has been amended to permit trial coverage as of January
26. The State Supreme Court had authorized permanent coverage of
its proceedings since December, 1977.
 A number of other states are considering allowing cameras in
the courts. The Supreme
*787 Court of New Jersey permitted one-day test coverage of its
proceedings on December 12, 1978. Details of these and other
major developments in the various states are provided under
state-by-state descriptions.
 While a number of individual judges allowed photographic and
television cameras in their courtrooms during the mid-fifties in
Idaho, Kansas, Oklahoma and Texas, Colorado was the first state
which officially began to allow coverage in 1956. The Estes
decision in 1965 (381 U.S. 532, 536) in effect, closed state
courtrooms to cameras because allowing cameras would be a
violation of the Fourteenth Amendment right to due process. Only
Colorado continued to allow cameras in the courtroom after Estes.
 State-by-State Description
A. STATES WHICH PERMIT COVERAGE ON PERMANENT BASIS:
 1. Alabama
 The Supreme Court adopted the Alabama Canons of
 Judicial Ethics in December, 1975, approving
 courtroom photography in trial and appellate courts
 with consent of all parties and following a plan
 approved by the state supreme court. In a criminal
 trial, all accused persons and the chief prosecuting
 attorney must give prior written consent before
 cameras will be allowed. In a civil proceeding, all
 litigants involved and their chief attorneys must
 give written consent.
 2. Colorado
 The Supreme Court of Colorado authorized
 photographing and broadcasting in the courtroom since
 February 27, 1956. Canon 3 A(7)-3 A(10) stipulate
 that there shall be no photographing or broadcasting
 of court proceedings unless permitted by order of the
 trial judge and only under the prescribed conditions.
 Consent of the accused and of witnesses and jurors
 under subpoena and the consent of the judge is
 required.
 3. Georgia
 The Canon 3 A was amended by the Supreme Court of
 Georgia on May 12, 1977 to include a new subparagraph
 (8). Canon 3 A(8) states that the Supreme Court may
 authorize the broadcasting, televising, recording,
 filming and taking of photographs in the courtrooms
 of the state including the Supreme Court. A plan for
 any use of cameras in the courtroom must be approved
 by the Supreme Court in advance. If witnesses or
 jurors do not provide consent, cameras may be allowed
 in the courtroom but may not photograph or film those
 refusing to give consent.
 4. New Hampshire
 The Supreme Court adopted a rule # 29, authorizing
 photograph or broadcast by radio or television, of
 its oral proceedings with prior consent of the court
 effective January 1, 1978. Amendment of Rule 78(a)
 effective January 29, 1979, allows photographing,
 recording, broadcasting by radio, television or other
 means, court proceedings upon prior approval and
 order of the Presiding Judge.
 5. Texas
 The state Code of Judicial Conduct was amended in
 November, 1976, which permits recording by electronic
 means of oral arguments by the parties in appellate
 courts. Prior consent must be obtained from the
 presiding judge.
 6. Washington
 The Supreme Court approved the amendment of Canon 3
 A(7) in September, 1976 which permits a judge to
 prescribe conditions for coverage of judicial
 proceedings. If witnesses and jurors express prior
 objection, no telecast or photographs are allowed of
 those persons. A Supreme Court authorized experiment
 was conducted in December, 1974.
B. EXPERIMENTAL COVERAGE IS PERMITTED IN THE FOLLOWING STATES:
 1. Alaska
 The Supreme Court authorized one-year pilot program
 governing media coverage of proceedings in the
 Supreme Court and in the Trials Courts in Anchorage.
 Prior approval of a plan for media coverage by the
 supreme court is required.
*788 Prior consent must be obtained from the judge and
 counsel for all parties. Without permission of
 witnesses or jurors broadcast or telecast is not
 allowed. The program began September 18, 1978.
 2. California
 The Judicial Council of California approved on
 December 2, 1978, a one-year experimental program to
 permit broadcasting and photographing of court
 proceedings in selected courts with the consent of
 the judge and the parties and without cost to the
 Judicial Council or the courts. Chief Justices'
 Special Committee on the Courts and the Media has
 been appointed to advise the Judicial Council in
 developing rules and procedures for conducting and
 evaluating the project. The Committee's report is
 expected in June.
 3. Florida
 The state Supreme Court was first petitioned by the
 Post-Newsweek Stations, Florida, Inc. in May 1975 to
 amend Canon 3 A(7) relaxing the ban on coverage.
 After studying the issue the Court agreed that two
 trials be selected for the experiment which were to
 be conducted under specific guidelines including
 consent of all parties. Attempts to find trials for
 the experiment were unsuccessful.
 A one-year pilot program was approved by the Court
 starting July 1, 1977. Under this program the court
 allowed an exception to Canon 3 A(7) of the Florida
 Code of Judicial Conduct. The Zamora murder trial
 came during the experimental period. This pilot
 program was terminated in June, 1978, as scheduled to
 evaluate the effects of the experiment. A sample
 survey of the attitudes of individuals associated
 trials involving electronic media and still
 photography coverage was conducted in Florida.
 (Copies of the Survey were mailed by the National
 Center to the members of CCJ and COSCA in November,
 1978.) The decision of the Court is expected soon.
 4. Idaho
 The Supreme Court authorized an experimental
 broadcast and photographic coverage including radio,
 televising and electronic recording of public
 hearings and appeals before the Supreme Court. The
 experiment began on October 18, 1978, and it is to
 terminate on June 30, 1979.
 (Idaho is one of the four states allowing cameras
 in supreme court sessions only. The other three
 states are Minnesota, North Dakota and Tennessee).
 5. Louisiana
 The Supreme Court approved February 23, 1978 a
 one-year pilot project on camera and electronic
 coverage of court proceedings in Division B of the
 Ninth Judicial District Court for Rapids Parish.
 Written permission of the parties and their counsel
 is required. In criminal cases, this includes the
 victim and the District Attorney. It has not been
 possible to record and telecast a full trial until
 the end of January because of the lack of permission.
 (We understand that since the parties have given
 permission, a trial is likely to be covered in
 February.)
 6. Minnesota
 The Supreme Court adopted on January 27, 1978,
 rules governing experimental coverage of oral
 arguments in the Court by television, radio and
 photography. The rule stipulates suspension of Canon
 3 A(7) at the discretion of the Court in particular
 cases.
 7. Montana
 Canon 35 of the Montana Canons of Judicial Ethics
 was suspended effective April 1, 1978 for an
 experimental period of two years. All court
 proceedings open to the public shall permit the
 recording and broadcasting. No consent is required.
 If, however, coverage is not permitted, the presiding
 judge must state reasons for such prohibition in the
 record of such case.
 8. North Dakota
 The Supreme Court authorized one-year experimental
 electronic media and photographic coverage of certain
 proceedings
*789 before the Court. The rule provides for an evaluation
 of the experiment at its conclusion on January 31, 1980.
 9. Oklahoma
 The Supreme Court revised Canon 3 A(7) for an
 experimental period of one year effective January 1,
 1979. A judge is authorized to permit broadcasting,
 televising, recording and taking photographs in the
 courtroom. If prior objection is expressed to the
 judge by jurors, parties, and witnesses, they may not
 be photographed or their testimony broadcast or
 telecast. Consent of the parties is required in
 criminal proceedings.
 10. Tennessee
 By amending the Tennessee Code of Judicial Conduct,
 the Supreme Court permitted photographic and
 broadcast coverage of the oral arguments presented to
 the Court for "a reasonable test period." The
 experiment began May 24, 1978.
 11. West Virginia
 The Supreme Court authorized a six-month experiment
 for television and broadcast coverage in Monongahela
 County (Morgantown) Circuit Court. No consent is
 necessary, but if witnesses, jurors and counsel
 express prior objection, they cannot be photographed
 or televised. Experiment began Jan. 22, 1979.
 12. Wisconsin
 The Supreme Court ordered a suspension of Rule 14
 of the State Code of Judicial Ethics for a one-year
 experimental period beginning April 1, 1978. The
 guidelines require designation of a coordinator to
 work with the chief judge of the district and
 presiding judge in a court providing the use of
 cameras.
C. STATES ACTIVELY CONSIDERING ALLOWING COVERAGE INCLUDE:
 1. Arkansas
 The American Bar Association's Committee on Cameras
 in Courtroom has been examining this subject. It is
 not certain whether the state judiciary is involved
 in this study.
 2. Delaware
 The Supreme Court sponsored a television
 demonstration for the Supreme Court judges in May,
 1978, to acquaint the judges with television
 equipment and procedures. Subsequently, the Chief
 Justice appointed two study groups from the Delaware
 Bar Association and the Bar-Bench Press Conference to
 make recommendations to the Chief Justice by May 1,
 1979.
 3. Massachusetts
 The Supreme Judicial Court appointed on January 31
 an Advisory Committee on Media Coverage in Court. The
 Committee has been charged with presenting its
 recommendations by April 30 concerning camera in the
 courts.
 4. Nebraska
 The Nebraska State Bar Association's Bar-Media
 Committee has been studying the questions relating to
 televising of courtroom proceedings. The extent of
 the state courts involvement in this program is not
 known but, it is understood, that the Chief Justice
 is interested in the work of the Committee.
 5. Nevada
 The Supreme Court Rule 240 permits taking of still
 photographs in the courtroom to be "regulated by
 local rule or practice." The Nevada Canon 3 A(7) of
 Judicial Ethics prohibits cameras on motion of the
 court, attorney or at the request of a witness. The
 canon follows the supreme court rule as above. The
 Nevada Code of Law, Section 1.220, however, prohibits
 cameras in the courtroom.
 6. New Jersey
 The Supreme Court relaxed the provisions of the
 Canon 3 A(7) for the purpose of permitting the
 videotaping of the proceedings of the Court on
 December 12, 1978. Since then, the Supreme Court has
 appointed a special committee to study and report on
 allowing television and photographic coverage in the
 courts. The committee is expected to present its
 recommendations by the end of March.
 7. Ohio
 The Supreme Court had appointed two committees of
 broadcasters and newspaper publishers. Both these
 committees presented their reports last summer. The
*790 court then invited comments about the proposals
 submitted by the two groups. The matter is presently
 under consideration by the Court.
 8. Rhode Island
 The Chief Justice appointed a special committee
 last Fall to review the rules of the Court regarding
 television, radio and photographic coverage. The
 Committee is expected to present its recommendations
 sometime this Summer.
 National Center for State Courts
 300 Newport Avenue
 Williamsburg, Virginia 23185
 (804) 253-2000
 RULES CONCERNING TELEVISION, RADIO AND PHOTOGRAPHIC
 COVERAGE OF JUDICIAL PROCEEDINGS
 SUMMARY TABLE
 A. STATES WHICH PERMIT COVERAGE[**] ON PERMANENT BASIS:
 State Authority and Nature of Coverage Effective Date
 1. Alabama Supreme Court authorizes and approves Feb. 1, 1976
 coverage plan. Consent of parties
 required.
 2. Colorado Judicial Canons permit coverage (first Feb. 27, 1956
 state to allow.) Consent of the
 accused, witness, juror and judge
 required.
 3. Georgia Supreme Court authorizes and approves May 12, 1977
 coverage plan. All plans require
 prior consent.
 4. New Hampshire Supreme Court authorized coverage of Jan. 1, 1978
 its proceedings. Rule has been
 amended to allow trial coverage as
 of Jan. 26, 1979. No consent
 required.
 5. Texas Supreme Court authorized appellate Nov. 9, 1976
 coverage.
 6. Washington Supreme Court approved rule. (Test was Sept. 20, 1976
 authorized and conducted in 1974.) If
 witnesses and jurors express prior
 objection, no telecast or photographs
 allowed.
 B. STATES WHICH PERMIT COVERAGE ON EXPERIMENTAL BASIS:
 1. Alaska Supreme Court authorized one-year pilot Sept. 18, 1978
 program in the Supreme Court and
 Anchorage Trial Courts. Consent of
 the parties and judge required.
 2. California Judicial Council approved one-year Dec. 2, 1978
 experimental coverage. Guidelines,
 evaluation procedures and the
 question of consent are being
 considered by a Special Committee.
 3. Florida One year experiment completed June 30, July 1, 1977
 1978. Its evaluation is under review
 by the state Supreme Court.
 4. Idaho Supreme Court authorized a seven-month Dec. 4, 1978
 experiment of proceedings in Supreme
 Court.
*791 5. Louisiana Supreme Court authorized one-year pilot Feb. 23, 1977
 program in Division B of the 9th
 Judicial District Court. Consent
 required.
 6. Minnesota Supreme Court authorized experimental Jan. 27, 1978
 coverage in the Supreme Court.
 7. Montana Supreme Court suspended the ban for a April 1, 1978
 two-year experimental period. Consent
 is not required.
 8. North Dakota Supreme Court authorized one-year Feb. 1, 1979
 experimental coverage of its
 proceedings.
 9. Oklahoma Supreme Court authorized one-year Jan. 1, 1979
 experiment. If prior objection is
 expressed, telecast or photographs
 not allowed.
 10. Tennessee Supreme Court authorized coverage of May 24, 1979
 its proceedings for "a reasonable
 test period."
 11. West Virginia Supreme Court approved a six-month Jan. 22, 1979
 experiment in Monongahela County
 (Morgantown) Circuit Court. Consent
 is not required.
 12. Wisconsin Supreme Court suspended the ban on April 1, 1978
 coverage for one-year period. Consent
 not required.
 C. STATES ACTIVELY CONSIDERING ALLOWING COVERAGE INCLUDE:
 Arkansas, Delaware, Massachusetts, Nebraska, New Jersey (Supreme Court
 permitted one-day test coverage of its proceedings on Dec. 12, 1978),
 Ohio and Rhode Island.
 (Nevada Court rule and canons permit coverage whereas statutes prohibit
 it.)
 February 10, 1979
 RESOLUTION I
 TELEVISION, RADIO, PHOTOGRAPHIC
 COVERAGE OF JUDICIAL
 PROCEEDINGS
 WHEREAS, the Conference of Chief Justices appointed a
sixteen-member committee in February, 1978, to study the possible
amendment of Canon 3-A(7) of the Code of Judicial Conduct to
permit electronic and photographic coverage of the courts of our
nation under guidelines that would preserve the decorum and
fairness of our judicial proceedings; and
 WHEREAS, the Conference has discussed, debated, and considered
the judicial canon which bans broadcasting, televising, audio
recording, or taking photographs during trial and appellate
proceedings for news purposes; and
 WHEREAS, the highest court in each state has the authority and
responsibility to provide ethical standards, to upgrade the
quality of justice administered, and to improve the contact with
the public in each state; and
 WHEREAS, the news media, both print and electronic, serves an
important role in informing the public and it is in the best
interest of the public to be fully and accurately informed of the
operation of judicial systems;
*792 NOW, THEREFORE, BE IT RESOLVED by the Conference of Chief
Justices that the Canon 3-A(7) of the Code of Judicial Conduct be
amended by adding the following paragraph and the commentary:
 Notwithstanding the provisions of this paragraph, the
 (name the supervising appellate court or body in the
 state or federal jurisdiction) may allow television,
 radio, and photographic coverage of judicial
 proceedings in courts under their supervision
 consistent with the right of the parties to a fair
 trial and subject to express conditions, limitations,
 and guidelines which allow such coverage in a manner
 that will be unobtrusive, will not distract the trial
 participants, and will not otherwise interfere with
 the administration of justice.
 Commentary: If television, radio, and photographic
 coverage is permitted, it should be supervised by the
 appropriate appellate body which supervises the
 courts within its jurisdiction. It is necessary that
 there be express conditions and guidelines adopted by
 the supervising court or body in order to provide a
 specific manner and means for this type of media
 coverage. These guidelines should include the type
 and location of equipment, the discretion left to the
 individual trial or appellate court, and the
 necessity, if any, to obtain the consent of the
 participants. Absent special circumstances for good
 cause shown, no consent appears necessary in
 appellate courts. Special circumstances may exist in
 all courts for the restriction of this type of
 coverage in cases such as rape, custody of children,
 trade secrets, or where such coverage would cause a
 substantial increase in the threat of harm to any
 participants in a case.
 BE IT FURTHER RESOLVED that the Conference designate the
National Center for State Courts as the clearinghouse for all
photographic and electronic in-the-courtroom information for
various states and federal jurisdictions. In order to provide the
complete exchange of information, the Conference recommends that
each jurisdiction forward to the National Center all rules,
statistics, guidelines, opinions, reports, and other information
pertaining to the use of photographic and electronic devices in
the courtrooms of their states, and that all information be made
readily available to the courts upon request.
 Adopted at the annual meeting held in Burlington, Vermont,
August 2, 1978.
 APPENDIX 3
STANDARDS OF CONDUCT AND TECHNOLOGY GOVERNING ELECTRONIC MEDIA
 AND STILL PHOTOGRAPHY COVERAGE OF JUDICIAL PROCEEDINGS
 1. Equipment and personnel.
 (a) Not more than one portable television camera [film camera 
16 mm sound on film (self blimped) or video tape electronic
camera], operated by not more than one camera person, shall be
permitted in any trial court proceeding. Not more than two
television cameras, operated by not more than one camera person
each, shall be permitted in any appellate court proceeding.
 (b) Not more than one still photographer, utilizing not more
than two still cameras with not more than two lenses for each
camera and related equipment for print purposes shall be
permitted in any proceeding in a trial or appellate court.
 (c) Not more than one audio system for radio broadcast purposes
shall be permitted in any proceeding in a trial or appellate
court. Audio pickup for all media purposes shall be accomplished
from existing audio systems present in the court facility. If no
technically suitable audio system exists in the court facility,
microphones and related wiring essential for media purposes shall
be unobtrusive and shall be located in places designated in
advance of any proceeding by the chief judge of the judicial
circuit or district in which the court facility is located.
 (d) Any "pooling" arrangements among the media required by
these limitations on equipment and personnel shall be the sole
responsibility of the media without calling
*793 upon the presiding judge to mediate any dispute as to the
appropriate media representative or equipment authorized to
cover a particular proceeding. In the absence of advance media
agreement on disputed equipment or personnel issues, the
presiding judge shall exclude all contesting media personnel
from a proceeding.
 2. Sound and light criteria.
 (a) Only television photographic and audio equipment which does
not produce distracting sound or light shall be employed to cover
judicial proceedings. Specifically, such photographic and audio
equipment shall produce no greater sound or light than the
equipment designated in Schedule A annexed hereto, when the same
is in good working order. No artificial lighting device of any
kind shall be employed in connection with the television camera.
 (b) Only still camera equipment which does not produce
distracting sound or light shall be employed to cover judicial
proceedings. Specifically, such still camera equipment shall
produce no greater sound or light than a 35 mm Leica "M" Series
Rangefinder camera, and no artificial lighting device of any kind
shall be employed in connection with a still camera.
 (c) It shall be the affirmative duty of media personnel to
demonstrate to the presiding judge adequately in advance of any
proceeding that the equipment sought to be utilized meets the
sound and light criteria enunciated herein. A failure to obtain
advance judicial approval for equipment shall preclude its use in
any proceeding.
 3. Location of equipment personnel.
 (a) Television camera equipment shall be positioned in such
location in the court facility as shall be designated by the
chief judge of the judicial circuit or district in which such
facility is situated. The area designated shall provide
reasonable access to coverage. If and when areas remote from the
court facility which permit reasonable access to coverage are
provided all television camera and audio equipment shall be
positioned only in such area. Video tape recording equipment
which is not a component part of a television camera shall be
located in an area remote from the court facility.
 (b) A still camera photographer shall position himself or
herself in such location in the court facility as shall be
designated by the chief judge of the judicial circuit or district
in which such facility is situated. The area designated shall
provide reasonable access to coverage. Still camera photographers
shall assume a fixed position within the designated area and,
once a photographer has established himself or herself in a
shooting position, he or she shall act so as not to call
attention to himself or herself through further movement. Still
camera photographers shall not be permitted to move about in
order to obtain photographs of court proceedings.
 (c) Broadcast media representatives shall not move about the
court facility while proceedings are in session, and microphones
or taping equipment once positioned as required by 1.(c) above
shall not be moved during the pendency of the proceeding.
 4. Movement during proceedings.
 News media photographic or audio equipment shall not be placed
in or removed from the court facility except prior to
commencement or after adjournment of proceedings each day, or
during a recess. Neither television film magazines nor still
camera film or lenses shall be changed within a court facility
except during a recess in the proceeding.
 5. Courtroom light sources.
 With the concurrence of the chief judge of a judicial circuit
or district in which a court facility is situated, modifications
and additions may be made in light sources existing in the
facility, provided such modifications or additions are installed
and maintained without public expense.
 6. Conferences of counsel.
 To protect the attorney-client privilege and the effective
right to counsel, there
*794 shall be no audio pickup or broadcast of conferences which occur
in a court facility between attorneys and their clients, between
co-counsel of a client, or between counsel and the presiding
judge held at the bench.
 7. Impermissible use of media material.
 None of the film, video tape, still photographs or audio
reproductions developed during or by virtue of coverage of a
judicial proceeding shall be admissible as evidence in the
proceeding out of which it arose, any proceeding subsequent or
collateral thereto, or upon any retrial or appeal of such
proceedings.
 8. Appellate review.
 Review of an order excluding the electronic media from access
to any proceeding, excluding coverage of a particular participant
or upon any other matters arising under these standards shall be
pursuant to Florida Rule of Appellate Procedure 9.100(d).
 SCHEDULE A
FILM CAMERAS _________________ 16mm Sound on Film (self blimped)
 1. CINEMA PRODUCTS CP-16A-R Sound Camera
 2. ARRIFLEX 16mm-16BL Model Sound Camera
 3. FREZZOLINI 16mm (LW16) Sound on Film Camera
 4. AURICON "Cini-Voice" Sound Camera
 5. AURICON "Pro-600" Sound Camera
 6. GENERAL CAMERA SS III Sound Camera
 7. ECLAIR Model ACL Sound Camera
 8. GENERAL CAMERA DGX Sound Camera
 9. WILCAM REFLEX 16mm Sound Camera
VIDEO TAPE ELECTRONIC CAMERAS
 1. Ikegami HL-77 HL-33 HL-35 HL-34 HL-51
 2. RCA TK 76
 3. Sony DXC-1600 Trinicon
 3a. ASACA ACC-2006
 4. Hitachi SK 80 SK 90
 5. Hitachi FP-3030
 6. Philips LDK-25
 7. Sony BVP-200 ENG Camera
 8. Fernseh Video Camera
 9. JVC-8800 u ENG Camera
 10. AKAI CVC-150 VTS-150
 11. Panasonic WV-3085 NV-3085
 12. JVC GC-4800u
VIDEO TAPE RECORDERS/used with video cameras
 1. Ikegami 3800
 2. Sony 3800
 3. Sony BVU 100
*795 4. Ampex Video Recorder
 5. Panasonic 1 inch Video Recorder
 6. JVC 4400
 7. Sony 3800H

NOTES
[1] Unless the context otherwise requires, "electronic media" shall be used as a generic term which encompasses television film and video tape cameras, still photography cameras, tape recording devices, and radio broadcast equipment.
[2] Fla.Code Jud.Conduct, Canon 3 A(7) provides:

(7) A judge should prohibit broadcasting, televising, recording, or taking photographs in the courtroom and areas immediately adjacent thereto during sessions of court or recesses between sessions, except that a judge may authorize:
(a) the use of electronic or photographic means for the presentation of evidence, for the perpetuation of a record, or for other purposes of judicial administration;
(b) the broadcasting, televising, recording, or photographing of investitive, ceremonial, or naturalization proceedings;
(c) the photographic or electronic recording and reproduction of appropriate court proceedings under the following conditions:
(i) the means of recording will not distract participants or impair the dignity of the proceedings;
(ii) the parties have consented, and the consent to being depicted or recorded has been obtained from each witness appearing in the recording and reproduction;
(iii) the reproduction will not be exhibited until after the proceeding has been concluded and all direct appeals have been exhausted; and
(iv) the reproduction will be exhibited only for instructional purposes in educational institutions.
[3] Petition of Post-Newsweek Stations, Florida, Inc., 337 So.2d 804 (Fla. 1976).
[4] A Sample Survey Involving Electronic Media and Still Photography Coverage in Florida Courts Between July 5, 1977 and June 30, 1978; prepared by: The Judicial Planning Coordination Unit, Office of the State Courts Administrator (hereinafter referred to as "The Sample Survey"), Appendix A.
[5] Pauline Holden, Ph. D., University of Florida Criminal Justice Program.
[6] Judicial participants were surveyed by the Florida Conference of Circuit Judges and the results filed in this cause.
[7] Id.
[8] A separate questionnaire was composed for each group sampled, i.e., attorneys, witnesses, jurors, and court personnel (bailiffs, court clerks, and court reporters).
[9] The Sample Survey, § II. B.2.
[10] Id., Appendix A.
[11] Id.
[12] Id., § II. A.1., questions 1.-4. and 15.
[13] Id., § II. A.1., question 5.
[14] Id., § II. A.1., question 6.
[15] Id., § II. A.1., question 7.
[16] Id., § II. A.1., question 8.
[17] Id., § II. A.1., question 9.
[18] Id., § II. A.1., question 10.
[19] Id., § II. A.1., questions 11 and 12.
[20] Id., § II. A.1., question 13.
[21] Id., § II. A.1., question 14.
[22] Id., § II. A.1., question 16.
[23] Id., § II. A.1., question 17.
[24] Id., § II. A.1., questions 19-22.
[25] Id., § II. A.1., questions 23-26.
[26] Id., § II. A.2., question 2.
[27] Id., § II. A.3., question 5.
[28] Id., § II. A.3., question 7.
[29] Id., § II. A.3., questions 13-16.
[30] Report of the Florida Conference of Circuit Judges, Appendix-1.
[31] Id., Appendix-2.
[32] Id., Appendix-2.
[33] State v. Hauptmann, 115 N.J.L. 412, 180 A. 809, cert. denied, 296 U.S. 649, 56 S.Ct. 310, 80 L.Ed. 461 (1935).
[34] Proceedings of the Fifty-fifth Annual Meeting, Sixth Session, 18 ABA J. 761, 762 (1932).
[35] Ironically, such coverage of "investitive, ceremonial, or naturalization proceedings" is exempted from operation of Canon 35, presumably upon the premise that the conduct of such proceedings in a courtroom adds dignity to the event. See Fla. Code Jud. Conduct, Canon 3 A(7)(b).
[36] A complete summary of the history of Canon 35 is contained in an appendix to Justice Harlan's concurring opinion in Estes v. Texas, 381 U.S. 532, 596, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).
[37] Proposed Standard 8-3. 6(a).
[38] Id.
[39] No showing of actual prejudice was required. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In Rideau the defendant was subjected to a televised interview in his jail cell the morning following his arrest. Thousands of people watched on television as Rideau, flanked by the sheriff and two state troopers, admitted in detail the commission of a robbery, kidnapping, and murder in response to leading questions by the sheriff. The Supreme Court held that it was a denial of due process to refuse Rideau's request for a change of venue, "after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged." 373 U.S. at 726, 83 S.Ct. at 1419. The Court concluded that "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." Id. There is no evidence of any televised coverage of courtroom proceedings in Rideau, and thus it has no application here.
[40] Canon 28 of the State Bar of Texas left to the discretion of the trial judge the question of the presence of cameras.
[41] 381 U.S. at 540, 85 S.Ct. at 1631.
[42] In dissent, Justice Brennan agreed that "today's decision is not a blanket constitutional prohibition against the televising of state criminal trials." 381 U.S. at 617, 85 S.Ct. at 1678 (emphasis in original).
[43] It should be here noted that eighteen jurisdictions have adopted either permanent or experimental rules allowing some form of electronic media coverage of judicial proceedings, and additional states have such rules under consideration. See Appendix 2 to this opinion for a report of recent developments in the adoption of rules for permitting electronic media coverage of judicial proceedings prepared by the National Center for State Courts dated February 7, 1979.
[44] 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In Sheppard, the Court reversed the conviction of Dr. Sam Sheppard due to the prejudicial impact of pretrial publicity and the trial court's failure to protect the defendant's right to a fair trial.
[45] 381 U.S. at 539-42, 85 S.Ct. 1628.
[46] Report of the Florida Conference of Circuit Judges, Appendix-1.; Brief of Amicus Curiae Hirschhorn and Freeman, P.A., p. 3.
[47] Supra note 13, at 768.
[48] See, e.g., Report of Judge Paul Baker re: Conduct of Audio-Visual Trial Coverage, filed Dec. 15, 1977, at 3-4.
[49] Supra note 12, at 768.
[50] See Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947); Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946); Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941).
[51] Supra note 21, at 769; note 25, at 769; note 31, at 770.
[52] Petition of Post-Newsweek Stations, Florida, Inc., 347 So.2d 404 (Fla. 1977).
[53] Brief of Amicus Curiae Hirschhorn and Freeman, P.A., app. at 46.
[54] Kreusler v. Sholts, 355 So.2d 515 (Fla. 1978) (prohibition denied).
[55] Report of Judge Thomas E. Sholts re Conduct of Audio-Visual Trial Coverage, filed June 19, 1978, at 4-5.
[56] Id., at 10-11.
[57] See Remarks by Fred W. Friendly, Edward R. Murrow, Professor of Broadcast Journalism, Columbia University Graduate School of Journalism, at the National Conference on State Courts, Williamsburg, Virginia, March 20, 1978, at 17.
[58] Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).
[59] See, e.g., ch. 119, Fla. Stat. (1977) (inspection of public records law); § 286.011, Fla. Stat. (1977) (open public meetings law); art. II, § 8(a) and (b), Fla. Const. (full and public financial disclosure by public officials and candidates).
[60] Remarks by Allen Morris, Clerk, Florida House of Representatives, at Annual Meeting of the American Society of Legislative Clerks and Secretaries, New Orleans, La., November 29, 1977, at 13 (emphasis supplied).
[*] A copy of the resolution is attached to this appendix.
[**] Includes television, radio and photographic coverage.