378 So.2d 862 (1979)
PALM BEACH NEWSPAPERS, INC., Petitioner,
v.
The STATE of Florida, Respondent.
No. 79-2096.
District Court of Appeal of Florida, Fourth District.
December 20, 1979.
Rehearing Denied January 24, 1980.
Talbot D'Alemberte of Steel, Hector & Davis, Miami, for petitioner.
Jim Smith, Atty. Gen., Tallahassee, and Robert L. Bogen, Asst. Atty. Gen., West Palm Beach, for respondent.
Florence Beth Snyder, West Palm Beach, for amicus curiae  Florida Society of Newspaper Editors.
DOWNEY, Chief Judge.
In this proceeding the media, in the person of Palm Beach Newspapers, Inc., seeks *863 review of a trial court order curtailing the activities of the electronic media in reporting the trial of a criminal case.
In a case pending in the Circuit Court, Arthur Michael Sekell stands indicted for first degree murder for allegedly killing William Wright, Jr., by setting him afire. A pretrial motion was filed by the state requesting the court to limit filming or photographing of two witnesses. The motion alleges that both witnesses are inmates at Lantana Correctional Institute and are vital to the state's case; both fear that if there is television coverage of the trial while they testify their personal safety in prison will be greatly jeopardized.
The press was given notice of the hearing on said motion and counsel for the petitioner was present. As the hearing opened the state furnished the court and defense counsel with affidavits from the two witnesses in question. Counsel for petitioner was not furnished copies of these affidavits nor apprised directly of their contents. However, the prosecutor advised the court that neither of the witnesses would testify at trial, even under pain of contempt, if their testimony were televised or if they were photographed. He also advised the court that a Lieutenant from the prison was present to testify regarding the danger envisioned by the witnesses. An extended colloquy thereafter ensued, mostly between counsel for the defense and the press, on the one hand, and the trial judge, on the other, concluding with the judge's announcing:
So I will grant the motion and I will not permit the still cameras photography or the televising if there is going to be any televising.
Earlier in the hearing, in an attempt to point up the folly in prohibiting photographs and the televising of the witnesses, counsel for the press suggested that the press was free to make sketches of the witnesses or publish existing photographs and thus divulge their image to the public. At this suggestion the trial judge stated he would bar that activity also. No written order was entered, but the parties have treated the court's ruling as being restricted to photographs, sketches and televising of the two witnesses in question.
The focus of this case, as we see it, is not on the constitutional right of access to the courts, but rather on the proper construction and interpretation of the guidelines set forth by the Supreme Court in Florida in In Re Petition of Post-Newsweek Stations, Florida, Inc., for Change in Code of Judicial Conduct, 370 So.2d 764 (Fla. 1979). In that case of original jurisdiction, after a lengthy pilot program to study the effects of the electronic media in the courtroom, the Supreme Court concluded that Canon 3 A(7), Florida Code of Judicial Conduct, prohibiting broadcasting, televising, recording or taking photographs in the courtroom was no longer required to insure a defendant's right to a fair trial or to preserve an atmosphere conducive to judicial proceedings. Thus, said Canon was amended to allow electronic media and still photography coverage of public judicial proceedings in the appellate and trial courts of this state in accordance with the standard of conduct and technology promulgated by the Supreme Court. The allowance of such media coverage, however, was made subject to the authority of the trial judge to control the proceedings before the court so as to ensure decorum, prevent distraction and ensure the fair administration of justice. For clarity, the Court included its own commentary which, in pertinent part, points out that the revised Canon constitutes a general authorization for electronic media and still photography coverage of court proceedings for all purposes, subject to the limitation of the court's own standards having to do with equipment, personnel, etc.
The Post-Newsweek Court recognized that there are unique problems which can arise with respect to particular participants in judicial proceedings, such as a child in a custody proceeding, prisoners, confidential informants, sexual battery victims and witnesses under identity protection. Therefore, it was felt expedient to promulgate a standard to assist the presiding judge in exercising his discretion in determining whether to prohibit electronic media coverage *864 of a particular participant. In that regard the Court stated:
[W]e deem it imprudent to compile a laundry list or adopt an absolute rule to deal with these occurrences. Instead, the matter should be left to the sound discretion of the presiding judge to be exercised in accordance with the following standard:
The presiding judge may exclude electronic media coverage of a particular participant only upon a finding that such coverage will have a substantial effect upon the particular individual which would be qualitatively different from the effect on members of the public in general and such effect will be qualitatively different from coverage by other types of media. (Emphasis added.) 370 So.2d at 779.
The state contends that Post-Newsweek authorizes the exclusion of electronic media when individuals who fall into one of the enumerated categories, such as prisoners, are called to testify. Further, the state seems to be of the view that the trial judge need not support his decision to limit electronic or still photography coverage with a finding of necessity since the necessity, in such instances, is presumed. We reject that analysis of the Post-Newsweek case. On the contrary, while it is incumbent upon the trial judge to protect those witnesses who by testifying in front of the electronic media may actually be exposed to serious harm, the need for such unique protection must be clearly demonstrated by competent evidence. Our concern on this review is to determine whether the record before this court comports with the foregoing standard. It is our conclusion that it fails to do so.
We think it was appropriate for the court to require notice to the media of the hearing on the state's motion to curtail electronic and still photography. Ostensibly, the purpose of such a proceeding is for the presiding judge to hear evidence so that he can make findings as a predicate for the exercise of his discretion in granting or denying the motion. In the nature of things, we would expect the press to contest any proposed limitation upon full coverage as envisioned by Canon 3 A(7), supra. Therefore, the party moving for a limitation on coverage would seem to have the burden of adducing some credible evidence necessitating the limitation, while the press should have the right to cross-examination and the adduction of contrary proof.
In the case at bar the state filed a motion which alleged essentially that it had two vital witnesses who were inmates of a Florida prison and that they were afraid if their testimony were televised or they were photographed their personal safety would be jeopardized. The trial court was furnished with identical affidavits from the two witnesses, which the prosecutor and Attorney General state show the witnesses will refuse to testify if their testimony is to be televised or photographed because they fear for their safety in prison. At the hearing the prosecutor also advised the court that the state had a prison official present who would testify in support of the motion. However this testimony was not presented and, as we mentioned earlier, the trial court discussed the matter with counsel and, based solely upon the motion and affidavits, the motion was granted.
We emphasize that the trial judge made no findings, as required by the Post-Newsweek standard, nor, in our judgment, could he have done so. The motion and affidavits[1] simply set forth subjective fears of the two witnesses involved without any objective facts upon which the court could make a determination regarding the substantive validity thereof; to say nothing of the inability of the press under the circumstances to test the substance of the state's position. No facts were shown so that the court could determine whether the alleged fear was real or imagined. To require less would result in an automatic exclusion of *865 the media upon any witness simply advising the court that he harbored some uncertainty about his safety should he be exposed to the media while testifying.
Finally, we see no reason for withholding the witnesses' affidavits from the press at the hearing or for their subsequent sealing in the record. No request was made that they be sealed nor do they contain any relevant matter not already known to the parties or reflected by the record which needed to be secreted.
In view of the foregoing the order sought to be reviewed is reversed and the cause is remanded to the trial court for the purpose of holding a further hearing so that findings can be made to enable the trial court to exercise its discretion in determining the issue presented. We also direct that the affidavits in question be unsealed and filed in the court file.
ANSTEAD, J., concurs.
LETTS, J., dissents in part.
LETTS, Judge, dissenting in part.
I agree with the majority that there was no reason to withhold the affidavits and Judge Sholts apparently confused this situation with a total blackout affecting all the media such as we had before us in Miami Herald Publishing Company v. State, 363 So.2d 603 (Fla. 4th DCA 1978). I also agree with the statement that the press should have been advised of the hearing. However, I would otherwise reluctantly affirm based on my interpretation of the Post Newsweek decision. First of all our majority speaks of "a finding of necessity", but the word necessity does not appear in the Post Newsweek decision. Post Newsweek "call[s] for ... an articulated standard for the exercise of the presiding judge's discretion in determining whether it is appropriate to prohibit electronic media coverage of a particular participant."[1] The Court then goes on to articulate the standard to be exercised in the "sound discretion" of the trial judge upon a finding that such coverage will have a substantial effect upon the particular individual who does not wish to be televised or photographed. The result in the case now before us hinges on what the "finding" minimally requires. Judge Downey sees it as a full evidentiary hearing with cross-examination and the like. I agree it is unfortunate that we have not been given clearer guidelines, but I see no reason why a finding cannot be predicated on affidavits. There are innumerable findings that control the outcome of cases, based on affidavits and I see no bar to same set forth by Post Newsweek.
As to the sufficiency of these particular affidavits I agree with the majority that mere subjective fears of the witnesses should be inadequate. Yet how can we so hold a trial judge to have abused his discretion when our own Supreme Court has clearly indicated that the subjective fears of fellow prisoners are enough? In the Post Newsweek case there appears the following passage commenting on the Mark Herman murder trial:
During the same trial Judge Sholts denied the objection to electronic media coverage interposed by an inmate of the Florida Corrections System who had been called as a witness by the state. Spurred by the fear of reprisals from fellow inmates if she testified, the prisoner refused to take the stand and as a result was held in contempt. It is not clear that in either instance the presiding judge perceived that discretion reposed in him to grant the objection by the witness.
Thus it would appear that we are foreclosed from holding subjective fears, coupled by refusal to testify, to be insufficient. It seems obvious that the affidavits now before us were tailored to conform to the above quotation.
There is too much license taken in one statement made by the majority when it concluded:
To require less would result in an automatic exclusion of the media upon any witness' simply advising the court that he *866 harbored some uncertainty about his safety should he be exposed to the media while testifying.
Commenting on the above quotation, it is obvious that Judge Sholts was not faced with "any" witness. He was faced with witnesses who were fellow inmates from jail. Nor does the fear for their lives expressed, quite comport with "some uncertainty about [their] safety" especially when the man they are afraid of has already allegedly killed another inmate. Lastly the majority ignores the fact that Judge Sholts was particularly influenced by the flat refusal to testify unless cameras (not the entire media) were excluded.
Two questions to which the majority gives no answer are: At this initial hearing to determine whether the cameras are to be excluded, must the witnesses, who have already said under oath that they will not testify if the cameras roll, testify and be cross-examined with the cameras rolling? What happens if they refuse.
At the beginning of this dissent I mentioned my reluctance to affirm and but for the wording of Post Newsweek I would reverse altogether, not remand. To me it makes little sense to suppose that the suppression of photographs or T.V. coverage will protect one prisoner from another. I concede that prison inmates are often only known to each other by street names and that newspaper circulation does not enjoy a high penetration in correctional institutes. Nevertheless it seems unlikely that the prison grapevine, referred to by counsel for the Amicus "as the most effective communication known to man," will not quickly spread the word when one prisoner squeals on another. The accused in the case before us is already being charged with the ghastly torching death of a fellow prisoner inside the jail (surely a classic demonstration of justified terror of him) and this very defendant will be sitting in the courtroom observing his betrayal with his own eyes and ears.[2] All this being so, I find it hard to accept that the suppressing of a photograph will provide a "qualitative difference" from the printed word.
There remains, however, the problem of recalcitrant witnesses who flatly refuse to testify if the cameras are rolling. If such witnesses are already in jail for extended periods, finding them in contempt is a futile gesture. Under such circumstances, if their testimony is essential to "insure the fair administration of justice" as set forth in Post Newsweek I cannot find a suppression of cameras to be outside the sound discretion of the trial judge. In this case, in extended colloquy, Judge Sholts commented on this very point which was a basis for his finding.
Nevertheless I remain convinced that the safety of these particular witnesses, if their fears are justified, will depend on the security arrangements made for them after they testify rather than on the suppression of their pictures. Accordingly, but for Post Newsweek I would reverse and permit the photography under the facts of this case.
NOTES
[1] The trial judge sealed the affidavits of the two witnesses but they have been furnished to this court for our consideration.
[1] emphasis added.
[2] I concede the witnesses are currently incarcerated at a different location from the defendant. However the word can easily be spread from one jail to another and others solicited to extract revenge.