177 N.J. Super. 221 (1980)
426 A.2d 68
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RICKY NEWSOME, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted November 18, 1980.
Decided December 18, 1980.
*222 Before Judges MICHELS, ARD and FURMAN.
Tort, Jacobs, Gross, Rosenberger & Todd, for appellant (Alan M. Lands on the brief).
John J. Degnan, Attorney General, for respondent (Thomas A. Penn, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by ARD, J.A.D.
Tried to a jury, defendant was convicted of first degree murder while armed and assault with intent to kill. He was *223 sentenced to the New Jersey State Prison for a term of life on the murder conviction and a consecutive term of seven to ten years for being armed. At the time of sentencing the trial judge merged the conviction for assault with intent to kill with the conviction for murder. This appeal followed.
Defendant urges as error the following:
POINT I As a result of the televising and broadcasting of the trial defendant was deprived of his Fourteenth and Fifth Amendment rights to due process and his Sixth Amendment right to a fair trial;
POINT II The Supreme Court Guidelines for Experimental TV Coverage fail to provide adequate methods for appellate review;
POINT III The seriousness of a homicide trial should have in and of itself precluded the use of television coverage on an experimental basis;
POINT IV The trial judge failed to comply with the guidelines for the experimental program of television coverage;
POINT V The admission into evidence of the hearsay statements by the victim identifying the defendant as the assailant prejudicially affected the substantial rights of the defendant and possess a clear capacity to bring about an unjust result.
The primary thrust of defendant's appeal in Points I through IV challenges the presence and use of radio and television in the courtroom during the trial. On May 1, 1979 the morning session of the second day of defendant's trial was the subject of coverage by one television camera and two still cameras. In addition, radio coverage was permitted.
This trial was the first in the State to be televised pursuant to a Supreme Court experimental program which relaxed 3 A(7) of the Code of Judicial Conduct prohibiting photographic and electronic media coverage of judicial proceedings. To put the matter in proper perspective, it is essential to understand that only the morning session of the second day of defendant's trial was covered by the aforementioned media. The coverage lasted two hours and consisted of the opening statements of counsel, a Wade hearing concerning the identification testimony of Leon Williams, the testimony of Frank Stites, an investigator who prepared the Williams' photo identification of defendant and the testimony of Phillip Mineer, who diagrammed and photographed the murder scene. The jury was present during the opening *224 statements and the testimony of Stites and Mineer. The trial took four days. At no time were the jurors photographed or televised. Televised excerpts and commentary on the trial appeared on the 5:30, 6:00 and 11:00 p.m., Channel 6 News programs.
Defendant does not point to a specific incident as proof of prejudice. He argues that by allowing the media coverage there occurred a per se denial of his Fifth and Fourteenth Amendment rights to due process as well as his Sixth Amendment right to a fair trial. We disagree.
The rules governing the courts of this State were promulgated by the Supreme Court pursuant to the obligation imposed upon it by Art. VI, § II, par. 3 of the New Jersey Constitution of 1947. Consistent with the foregoing obligation, R. 1:14 was adopted incorporating codes of ethics governing the conduct of members of the bar and the judges of all courts of this State. It states:
The Disciplinary Rules of the Code of Professional Responsibility and the Code of Judicial Conduct of the American Bar Association, as amended and supplemented by the Supreme Court and included as an Appendix to Part I of these rules, shall govern the conduct of the members of the bar and the judges of all courts of this State.
Canon 3 of the Code of Judicial Conduct provides in pertinent part as follows:
The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:
A. Adjudicative Responsibilities.
........
(7) A judge should prohibit broadcasting, televising, recording, or taking photographs in the courtroom and areas immediately adjacent thereto during sessions of court or recesses between sessions, except that a judge may authorize:
(a) the use of electronic or photographic means for the presentation of evidence, for the perpetuation of a record, or for other purposes of judicial administration.
Normally Canon 3 of the Code of Judicial Conduct, being part of our rules of general application governing the practice and procedure in the administration of our courts, would prohibit *225 radio and television coverage of court proceedings. However, the Supreme Court's Committee on Relations with the Media made a study of audio-visual coverage of court proceedings. In the course of the committee's business a subcommittee was created to gather information with respect to electronic coverage of trials in several states. Among other things, this committee ascertained that the states of Colorado, Washington, Alabama and Florida have adopted rules which allow ongoing electronic media in-court coverage. In addition, the subcommittee recommended to the full committee that the Supreme Court authorize an experimental program of television, radio and still camera coverage of a criminal trial. The Committee on Relations with the Media unanimously recommended that the Supreme Court relax Canon 3 A(7) of the New Jersey Code of Judicial Conduct in order to authorize an experimental program of television, still camera and radio coverage of court proceedings in New Jersey. 101 N.J.L.J. 450 (May 4, 1978). Pursuant to this recommendation, the Supreme Court on March 15, 1979 entered the following order:[1]
It is ORDERED that the provisions of Canon 3 A(7) of the Code of Judicial Conduct as adopted by this Court pursuant to R. 1:14 are hereby relaxed for the trial period of an experimental program permitting coverage of court proceedings by the electronic media and print photography; and it is further
ORDERED that the attached guidelines are approved for application throughout the trial period; and it is further
ORDERED that the trial period shall commence, in such counties as shall be designated from time to time by the Court, effective May 1, 1979.
As indicated in the order, extensive guidelines were promulgated to prevent disruption of the courtroom. 103 N.J.L.J. 269 (March 29, 1979). Included in the guidelines was a provision that the trial period should run for one year or until at least six *226 trial court cases have been covered. Subsequently the Supreme Court extended the program to July 1, 1981. 106 N.J.L.J. 407 (November 13, 1980).
The guidelines are quite comprehensive. They limit the equipment and personnel allowed in the courtroom; set criteria for the light, sound and location of the equipment and personnel; prohibit movement of equipment during the proceedings; guarantee the confidentiality of the attorney-client privilege, and among other general protections require a mandatory pretrial conference to review the guidelines and insure courtroom decorum.
We have canvassed the entire record and are satisfied the trial judge scrupulously adhered to the mandates set forth in the guidelines. Defendant's allegation that the trial judge failed to comply with these guidelines does not find support in the record before us. The argument that the record fails to disclose whether or not the assignment judge actually positioned the cameras but rather approved the positioning as ordered by the trial judge is specious. The record clearly indicates the assignment judge checked the courtroom and the position of the cameras and indicated his approval. This type of supervision is more than sufficient.
Lastly, with respect to the media coverage, we deal with defendant's allegations of the denial of his constitutional rights, namely, his assertion that he was denied due process and a fair trial. In support of this argument, defendant appears to rely solely on Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Such reliance is misplaced. In Estes as well as Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the United States Supreme Court dealt with a totality of circumstances surrounding the media coverage so gross as to warrant a finding that the trials were unfair.
The prejudice in both cases was most obvious. In Estes the Supreme Court describes the scene of the trial.

*227 Petitioner's case was originally called for trial on September 24, 1962, in Smith County after a change of venue from Reeves County, some 500 miles west. Massive pretrial publicity totaling 11 volumes of press clippings, which are on file with the Clerk, had given it national notoriety. All available seats in the courtroom were taken and some 30 persons stood in the aisles.
... Indeed, at least 12 camermen [sic] were engaged in the courtroom throughout the hearing taking motion and still pictures and televising the proceedings. Cables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table. It is conceded that the activities of the television crews and news photographers led to considerable disruption of the hearings. [381 U.S. at 535-536, 85 S.Ct. at 1629]
The Sheppard holding was also aimed at the total carnival atmosphere of the trial.
... The fact is that bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard. At a temporary table within a few feet of the jury box and counsel table sat some 20 reporters staring at Sheppard and taking notes. The erection of a press table for reporters inside the bar is unprecedented. The bar of the court is reserved for counsel, providing them a safe place in which to keep papers and exhibits, and to confer privately with client and co-counsel. It is designed to protect the witness and the jury from any distractions, intrusions or influences, and to permit bench discussions of the judge's rulings away from the hearing of the public and the jury. Having assigned almost all of the available seats in the courtroom to the news media the judge lost his ability to supervise that environment. The movement of the reporters in and out of the courtroom caused frequent confusion and disruption of the trial. And the record reveals constant commotion within the bar. [384 U.S. at 355, 86 S.Ct. at 1639]
Thus, unlike the present case, it is clear that the circumstances of the media coverage clearly prejudiced the defendants. As noted in Petition of Post-Newsweek Stations, Florida, 370 So.2d 764, 772-773 (Fla.Sup.Ct. 1979):[2]

*228 Based on these facts, the Court had little trouble in finding that Estes was denied due process. The plurality opinion contains sweeping language which at first blush appears to cast doubt upon the constitutionality of any televising of a criminal trial. In his concurring opinion, however, Justice Harlan demonstrates that the Estes decision is limited to its peculiar facts:
"The Estes trial was a heavily publicized and highly sensational affair. I therefore put aside all other types of cases.... The resolution of those further questions should await an appropriate case; the Court should proceed only step by step in this unplowed field. The opinion of the Court necessarily goes no farther, for only the four members of the majority who unreservedly join the Court's opinion would resolve those questions now. 381 U.S. at 590-591, 85 S.Ct. at 1663-64 (emphasis supplied)."
Moreover, Justice Clark's characterization of the issue before the Court in Estes belies the seemingly expansive reach of the decision:
"While petitioner recites his claim in the framework of Canon 35 of the Judicial Canons of the American Bar Association he does not contend that we should enshrine Canon 35 in the Fourteenth Amendment, but only that the time-honored principles of a fair trial were not followed in his case and that he was thus convicted without due process of law.... In short, the question here is not the validity of either Canon 35 of the American Bar Association or Canon 28 of the State Bar of Texas, but only whether petitioner was tried in a manner which comports with the due process requirement of the Fourteenth Amendment. 381 U.S. at 535, 85 S.Ct. at 1629 (emphasis supplied)." [footnotes omitted].
Our analysis of the United States Supreme Court holdings in Estes and Sheppard leads us to the conclusion that there is no per se prohibition against well-regulated, moderate electronic media coverage of judicial proceedings. The aforementioned cases do not stand for the proposition that the mere presence of television cameras in the courtroom deny defendants their fair trial and due process rights. We agree with the rationale of the Supreme Court of Florida in Petition of Post-Newsweek Stations, Florida, supra:
The Court [United States Supreme Court] expressly limited its opinion to the crude state of the television art existing in 1965 and acknowledged the advent of technological advances. "When the advances in these arts permit reporting by printing press or by television without their present hazards to a fair trial we will have another case." 381 U.S. at 540, 85 S.Ct. at 1631. Justice Clark, while noting that "at this time those safeguards [to ensure a fair trial] do not permit the televising and photographing of a criminal trial," concluded with the clear message that the decision did not forever proscribe such electronic media coverage:

*229 "It is said that the ever-advancing techniques of public communication and the adjustment of the public to its presence may bring about a change in the effect of telecasting upon the fairness of criminal trials. But we are not dealing here with future developments in the field of electronics. Our judgment cannot be rested on the hypothesis of tomorrow but must take the facts as they are presented today. 381 U.S. at 551-52, 85 S.Ct. at 1637." [370 So.2d at 773; footnote omitted]
Moreover, we respectfully presume that implicit in the relaxation of Canon 3 A(7) by our Supreme Court is a rejection of defendant's theory that electronic coverage results in a per se denial of his due process rights. Consequently, since we are satisfied there is nothing inherently prejudicial in the media coverage in this trial, we find no error.
On the other hand, there are many inherent problems caused by the presence of television cameras. It is for this very reason that the Supreme Court authorized an experimental program for a limited trial period. At the end of the experimentation period, the Supreme Court will be able to evaluate the entire problem and hopefully will be able to determine whether the benefits gained by television coverage are outweighed by the risk of prejudice to the defendant. To put it another way, the court will then be in a position to determine whether the chief objective of a trial, the ascertainment of truth, is fostered or hindered by the use of television in the courtroom. The study will give our court some empirical data and will assist in answering the question of whether the camera is compatible with fairness. Only a pilot program such as this will enable the court to determine whether electronic media coverage of courtroom proceedings is harmonious with the primary purpose of the trial. Without the experimental program the answers to the many questions posed by this problem become too speculative. Until the experimental program is completed we can only determine the effect of media coverage on a case-by-case basis. In this case we have found no demonstrable prejudice present in the record. The trial judge scrupulously guarded the rights of defendant. In another case, with a different record, we may reach a different result.
*230 Finally, in addition to the issues raised by television coverage of his criminal trial over his objection, defendant also alleges the court erred in admitting the victim's statements to Carol Scott and Virginia Hill that he had been shot by Ricky Newsome. This contention is also without merit. The trial judge admitted these statements as excited utterances. Evid.R. 63(4)(b) provides for the admission of a statement if it was made "while the declarant was under the stress of a nervous excitement caused by such perception, in reasonable proximity to the event, and without opportunity to deliberate and fabricate." Here, the declarant was the victim who made the statement shortly after he had been shot. The trial judge found they were made while the victim was excited and under stress. The record supports his determination, and he properly ruled the statements were excited utterances and therefore admissible. State v. Williams, 106 N.J. Super. 170, 172 (App.Div. 1969), certif. den. 55 N.J. 78 (1969), cert. den. 397 U.S. 1057, 90 S.Ct. 1510, 25 L.Ed.2d 691 (1970).
Affirmed.
NOTES
[1] In Busik v. Levine the late Chief Justice Weintraub stated, "[n]or, for that matter, is the constitutional grant of power with respect to `practice and procedure' a mandate that that subject may be dealt with only in a rule-making process.... And, finally, a matter of practice may be prescribed in an administrative directive." 63 N.J. 351, 362-363 (1973) (footnote omitted) (per Weintraub, C.J., with two Judges concurring and two Judges concurring with the result), app. dism. 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973).
[2] The United States Supreme Court has granted certiorari in Chandler v. Florida, 366 So.2d 64 (D.Ct.App. 1978), certif. den. 376 So.2d 1157 (Fla.Sup.Ct. 1979), 446 U.S. 907, 100 S.Ct. 1832, 64 L.Ed.2d 259 (1979), to decide the propriety of allowing television cameras in the courtroom during trial. Before the Chandler case reached the federal courts the Supreme Court of Florida in a short per curiam opinion denied certification and stated the question had been rendered moot by the decision in Petition of Post-Newsweek Stations, Florida, supra.