719 A.2d 724 (1998)
316 N.J. Super. 144
Roxanne COOK, Plaintiff,
v.
FIRST MORRIS BANK, Defendant.
Superior Court of New Jersey, Law Division, Morris County.
Decided July 17, 1998.
*725 Peter L. Skolnik, Roseland, for Courtroom Television Network (Lowenstein Sandler, P.C., attorneys).
Walter Lucas, West Orange, for plaintiff (Lucas, Savits and Marose, L.L.C., attorneys).
Arthur L. Raynes, Morristown, for defendant (Wiley, Malehorn and Sirota, attorneys).
VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).
This is an application by Courtroom Television Network ("Court TV"), a national cable news channel, for permission under Canon 3A(9) of the New Jersey Code of Judicial Conduct to televise the trial of this civil case. This written opinion supplements the oral opinion previously rendered.
Plaintiff, Roxanne Cook was employed by defendant, First Morris Bank for eight and one-half years as a branch manager. On May 6, 1996, plaintiff was advised by Ralph Riccioni, President of First Morris Bank ("the bank"), that she was an "at will" employee and that she was terminated. Less than two months earlier, plaintiff announced she was pregnant as a result of having been artificially inseminated by her brother-in-law so that she could be a surrogate mother for her younger sister who had been unable to conceive in nine years of marriage and had been diagnosed with breast cancer.
*726 In her complaint, plaintiff contends that this termination was "pregnancy discrimination" in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -40. The other two counts of plaintiff's complaint against the bank, which have been dismissed, involved an alleged common law invasion of privacy, and a constitutional violation of plaintiff's right to privacy. The bank defended the complaint and seeks attorneys fees under N.J.S.A. 10:5-27.1 on the grounds that the plaintiff's complaint has been brought in bad faith.
The bank's answer alleges that plaintiff's termination from the bank resulted from a series of actions and explanations for such actions that gave rise to substantial questions about her honesty, integrity and trustworthiness. Three instances involved missing cash that was either never recovered or found in plaintiff's possession or on her person. The fourth incident involved plaintiff's claim that her recently appraised diamond engagement ring was "stolen" while at work. The investigating detective from the local police department was skeptical of plaintiff's story regarding the ring because in his professional judgment it sounded "rehearsed" and she had been involved in two prior incidents where her rings were allegedly "stolen." Plaintiff's insurance carrier also expressed skepticism. Bank personnel were also aware of plaintiff's prior instances where her rings were "stolen."
In its counterclaim,[1] the bank alleged that the plaintiff spoke with a news reporter and caused a segment of an NBC television program to be broadcast on its "News Channel 4 at 11" program during which plaintiff and/or her agent allegedly made slanderous remarks regarding the bank. The bank also alleged that plaintiff or her agent spoke to a representative from The Star-Ledger regarding her termination of employment and made slanderous remarks about the bank. These remarks were reported in The Star-Ledger on October 7, 1996.
The only objection to Court TV's application has been made by the bank who contends that to allow television cameras to broadcast the trial presents plaintiff with a wide forum for the false and damaging accusations which would only cause further damage to its reputation. The bank also argues that thrusting this litigation into the sensational programming of Court TV would be unfair to the bank and the two-year old healthy boy to whom the plaintiff gave birth, bringing undue notoriety onto the child.
The bank asserts that this court should appoint a guardian ad litem pursuant to R. 4:26-2(b) to protect the boy. The bank has no standing to compel such an appointment. The boy is not a trial "participant" under the Supreme Court Guidelines, but nevertheless this court could, in its discretion, R. 4:26-2(b)(4), appoint a guardian ad litem but there is no reason to do so.
The facts surrounding the circumstances of the infant's birth have been and will be promulgated by the print media, and plaintiff's attorney represented that the family intends to inform the child about those circumstances in any event.
The bank, on its own behalf and purportedly for the benefit of the young boy, insists that the order permitting live television be conditioned upon a prohibition of rebroadcasting the television of this trial in future years. Court TV's attorney represented that it was "unlikely" that the trial would be rebroadcast in the near future, and even less likely that it would be rebroadcast several years from now. However, the Supreme Court Guidelines make no mention of regulating the schedule by which the media may broadcast New Jersey trials, or of conditioning permission to televise trials upon an agreement by the media to restrict rebroadcasts.
The Guidelines' omission of any regulation on this issue is apparently deliberate since to do so would raise serious concerns under the First Amendment of the United States Constitution and the New Jersey Constitution. If the media has the right to broadcast a trial under the Guidelines as a *727 surrogate for the public's right of access, as Court TV does here, the First Amendment would prohibit courts from dictating to the media when it may broadcast, just as courts may not tell newspapers when they may publish. See generally Nebraska Press Ass'n. v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Absent some compelling circumstances not present here, such a restriction would constitute an improper interference with the First Amendment right of the media to exercise its own journalistic judgment about how best to serve the needs of its audience.
Plaintiff's sister, who has adopted the child, does not object but has requested that her face not be shown. Court TV has acceded to this request.
The Court finds that televising these proceedings is permitted by Supreme Court policy and guidelines in accordance with general court policy, and the defendant has not presented any valid objection. This policy is in accord with the common law presumption of public access to court proceedings and court records, See Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). New Jersey courts have for many years had a "strong and consistent policy in favor of open judicial proceedings." State v. Williams, 93 N.J. 39, 56, 459 A.2d 641 (1983); see also R. 1:2-1.
After an experimental period, the New Jersey Supreme Court permitted statewide still and television camera and audio coverage of proceedings in the courts of New Jersey, which have been in effect since September 1986. There are only a few exceptions contained in Guideline 10(b) of the Supreme Court Guidelines for Still and Television Camera and Audio Coverage of Proceedings in the Courts of New Jersey. They involve:
proceedings in juvenile court or trial courts involving custody of children, divorce or matrimonial disputes, trade secrets and charges of sexual penetration or attempts thereof when the victim is alive, except that, when the victim is deceased, the court may deny permission in consideration of the victim's survivors or analogous concerns. Television, radio or still photographic coverage may be excluded in any proceeding where such coverage would cause a substantial increase in the threat of or the potential for harm to a participant in the case or would otherwise interfere with the achievement of a fair proceeding. Coverage of domestic disputes in the municipal courts is prohibited.
This case does not fit within any of those exceptions.
Guideline No. 11 also provides that "permission for coverage shall not be conditioned upon obtaining consent of any party or party's attorney or any witness or any participant in such a trial or Appellate argument." The Supreme Court in Williams pointed out: "This strong judicial and public policy of openness is also reflected in this Court's guidelines regulating electronic and photographic coverage of the courtroom." State v. Williams, supra, 93 N.J. at 56 n. 6, 459 A.2d 641.
"In January 1981, the United States Supreme Court held that such media coverage over the objection of a defendant did not constitute a deprivation of his constitutional rights in the absence of a showing of actual prejudice. See Chandler v. Florida, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). And see State v. Newsome, 177 N.J.Super. 221, 229, 426 A.2d 68 (App.Div.1980), similarly holding and presaging Chandler by several weeks." Pressler, Current N.J. Court Rules, comment 2 on R. 1:2-1 (1998).
Court TV provides extended television coverage of judicial proceedings. Attorneys and law professor commentators explain the law and procedural matters relating to the case. Its goal is to televise court proceedings in a balanced and dignified manner. In general, the function of Court TV, other than as a private business to make a profit, is to permit the public to gain some insight into the judicial system, how it works or how it does not work and thereby inform the public regarding an important part of government.
The Court understands the bank's concern regarding the effect this case may have on its business and its customers' confidence. That concern, however, must give way to the overall policy of open court proceedings in this State. It would be easy to find reasons for *728 secrecy in many cases. Almost all court cases are embarrassing in some way or another to somebody. If this policy of openness is undermined and open courtroom television is prohibited in favor of a policy of secrecy, before long a policy of openness would become a policy of secrecy. Nothing is more inimical to the values of a democracy than secrecy in any part of government, and the judiciary is an important part of government. Experience teaches that secrecy breeds distrust and nothing can be more pernicious to a democracy than when the citizens do not trust their own government.
The concerns of litigants must give way to the policy of openness in the judicial system, in our democratic tradition and as enshrined in the United States Constitution.
The application of Court TV is therefore granted conditioned upon their complying with the New Jersey Supreme Court Guidelines and agreeing not to display the face of plaintiff's sister.
NOTES
[1] First Morris Bank and Ralph Riccioni filed a counterclaim for defamation which was voluntarily dismissed shortly before trial.